[No. B009540. Second Dist., Div. Four. Nov. 4, 1985.]

BENJAMIN L. YELLEN, Plaintiff and Appellant, v.
BOARD OF MEDICAL QUALITY ASSURANCE,
Defendant and Respondent.

COUNSEL

Levy, Ansell & Goldman, Ellen Greenstone and Shelley Kaufman for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, and Lawrence C. Kuperman, Deputy Attorney General, for Defendant and Respondent.

OPINION

ARGUELLES, J.—Petitioner and appellant, Benjamin L. Yellen, (appellant) appeals from a judgment of the superior court denying his petition for writ of mandate, which sought review of a decision of the California Board of Medical Quality Assurance (Board) permanently revoking his license to practice medicine. The judgment is affirmed.

FACTS

On December 2, 1981, Winston Kavanaugh (Winston), a 16-month-old boy, was brought to appellant's office by his mother. He had a temperature of 103 degrees. Appellant gave Winston an injection containing Demerol, chlorpromazine, epinephrine, and sodium salicylate. He also wrote a prescription for a medication to be compounded by a pharmacist, containing:

"1. APAP - Acetaminophen - 1 dram

2. Opium Tincture = 10 minums

3. Chlorpromazine Thorazine - 1 grain

4. Benzocaine USP fine powder - 3 grains

5. Lidocaine Hydrochloride Injection 2% - 40 minums

6. Prednisolone Tabs USP ⅙ grain

7. Phenylpropanolamine Hydrochloride - 1 grain

8. Ampicillin - 38 grains

9. Saccharin - 40 grains

10. Compound Spirits of Aurenti - 10 minums

11. Propylene Glycol -1 dram

12. Polysorbate Atusp - 5 minums

13. Methylcellousc USP powder -10 grains

14. Aqua (water) - mix to four ounces

15. Liquid Purp (food coloring) red and blue"

Winston's mother gave him one teaspoon of this medication every four hours, as directed. On December 3, at 10 a.m., Winston's mother again took him to appellant's office, where appellant injected him with salicylates.

At about 1:45 p.m., the babysitter called Winston's mother to return home, then called again to say that Winston could not be aroused. His mother returned home and found him limp and blue. She took him to Pioneer Hospital emergency room, in Brawley, where Dr. Fred Greensite administered Narcan, because Winston had constricted pupils and was in a coma of unknown origin. A narcotic overdose was suspected. After a second dose of Narcan, Winston began breathing on his own.

Dr. Greensite found fluid in Winston's lungs and ordered other tests. When appellant could not be reached by phone, a friend of Winston's family went to appellant's office. Appellant called Dr. Greensite one to three hours after Winston's admission and told him that he had injected Winston with sodium salicylate that day; he also said that he had administered a similar medication the day before, but was not specific about its contents or those of the oral medication. He never mentioned giving opium, Demerol, or the other ingredients.

On December 3, Winston was transferred to Children's Hospital in San Diego. Dr. Nancy Powers examined him and found that he had pinpoint pupils, was breathing on his own and receiving oxygen. She ruled out meningitis and other possible diagnoses with tests, leaving narcotic overdose as her own diagnosis.

Over the next few days, Winston's condition worsened, including an episode of cardiac arrest, and he died on December 11.

Dr. Powers testified that the mixture of drugs administered by appellant was an extreme departure from the standard of practice.

A toxicological report done on December 3, showed the presence of morphine and salicylate, but no quantitative test was done.

In September 1982, an accusation was filed charging appellant with gross negligence and incompetence in treating Winston on December 2 and 3, 1981.

After a hearing before an administrative law judge (judge) in Brawley, on February 15 and 16, 1983, and in San Diego, on February 22, 23, 24, 25 and 28, and March 1 and 2, 1983, the judge issued a proposed decision, which was adopted by the Board. The decision included the following findings:

## "II

"On or about October 5, 1942, respondent was issued physician's and surgeon's certificate No. C-7049 by the Board. The license is in good standing.

## "III

"On or about December 2, 1981, at or about 10:00 a.m., Winston Kavanaugh, a sixteen month old child, was taken to respondent's office to treat a cough and fever. The respondent injected Winston with Demerol, 1 minum; Chlorpromazine, 1 minum; Epinephrine, 1 minum, and Sodium Salicylate, 4 minums.

## "IV

"At the same time, the respondent wrote out the prescription containing the following ingredients and Winston's mother was instructed to give the child one teaspoonful of the prescription every four hours, day and night.

"1. APAP - Acetaminophen - 1 dram

2. Opium Tincture = 10 minums

3. Chlorpromazine Thorazine - 1 grain

4. Benzocaine USP fine powder - 3 grains

5. Lidocaine Hydrochloride Injection 2% - 40 minums

6. Prednisolone Tabs USP ⅙ grain

7. Phenylpropanolamine Hydrochloride - 1 grain

8. Ampicillin - 38 grains

9. Saccharin - 40 grains

10. Compound Spirits of Aurenti - 10 minums

11. Propylene Glycol -1 dram

12. Polysorbate Atusp - 5 minums

13. Methylcellousc USP powder -10 grains

14. Aqua (water) - mix to four ounces

15. Liquid Purp (food coloring) red and blue

"The mother gave Winston one teaspoonful of this prescription at 2 p.m., 6 p.m. and 10 p.m. on the same day, as directed by the respondent.

## "V

"The following morning and on December 3, 1981, at about 10 a.m., Winston was again taken by his mother to the respondent's office with a fever but no cough. The respondent injected Winston with Salicylates, 16 minums.

## "VI

"The child was returned home and played for a while and at or about 1 p.m., he went into a respiratory arrest and was taken to Pioneers Hospital at Brawley. There he was given a tentative diagnosis of drug overdose and treated with Narcon.

## "VII

"Winston was then flown to Childrens Hospital, in San Diego, where he was treated for drug overdose.

## "VIII

"Winston Died on December 11, 1981. The attending physician stated that the cause of death was adenoviral sepsis, shock, pneumontis and encephalites. The pathologist for the Coronor determined the cause of death to be encephalomalacia, hypaic due to medication overdose.

## "IX

"While Winston was at Pioneers Hospital on December 3, 1981, a friend asked respondent what treatment he had given Winston and was told of the Salicylates injected that day. No mention was made of the prior treatment. At the request of the Brawley police, respondent called the attending physician at Childrens and related his treatment of Winston and his diagnosis.

". . . . . . . . . . . . . . . . . . . . . . . . .

## "XI

"It should be clearly pointed out that no finding is made herein as to whether the conduct of the respondent led to or contributed to Winston's death. Rather, the decision is based on the conduct of the respondent in prescribing the medicine and giving the injections to Winston on December 2 and 3, 1981. This was pointed out repeatedly to the respondent at the hearing.

". . . . . . . . . . . . . . . . . . . . . . . . .

## "XIII

"The respondent is a man of very strong convictions and opinions. He sees nothing wrong with the injections and type of prescription given to Winston and stated that he has provided similar treatment to Winston and others on many occasions. He believes in using his own prescriptions rather than relying upon prepared pharmaceuticals. He has many avid supporters of his methods of treatment in the Brawley area.

## "XIV

"The Deputy Attorney General has pointed out that the irascible nature of thre [sic] respondent is not likely to change and, in the event discipline be imposed, that the respondent is by his very nature not amenable to prac-

tice in a structured environment or to close supervision by his peers." (Fn. omitted.)

Following the Board's adoption of the judge's decision and its revoking appellant's license to practice medicine, appellant sought a writ of mandate from the superior court. Pending a review of the Board's decision, a temporary stay of the license revocation was granted, on condition that petitioner not prescribe any medicines other than prepared pharmaceuticals and not administer injections. The superior court then exercised its independent judgment upon the evidence to uphold the Board's decision, and rendered judgment denying the writ of mandate. This appeal followed.

## CONTENTIONS

Appellant contends that: (1) He was prejudicially denied due process and a fair hearing because: (a) he could not hear well; (b) he was denied discovery; (c) he was denied the effective opportunity to compel attendance of witnesses; (d) an inaccurate hypothetical question was used; (e) interested witnesses testified; and (f) he was denied a postponement of the hearing; (2) the Board's factual findings were insufficient to support its conclusions; and (3) imposition of the penalty of permanent revocation of appellant's license was an abuse of discretion.

## DISCUSSION

### I. DUE PROCESS CONTENTIONS

#### A. *Appellant's Hearing Difficulties*

■ Appellant contends that he was denied due process because he was hard of hearing and the administrative law judge did not provide him with sound amplification. The record does not support this contention.

Appellant represented himself at the administrative hearing. At the beginning of the hearing, he stated that he had difficulty hearing the judge and the deputy attorney general, and he asked that they speak louder. He also requested a "loudspeaker." However, appellant stated that he did not need a hearing aid, and the proceedings continued, with appellant apparently able to hear, except when he objected and asked witnesses to speak up. Their answers were then repeated. Appellant did not object frequently after the first few days of the hearing.

Appellant asserts in his opening brief, without reference to the record, that he heard a substantial portion of the proceedings inaccurately. Contrary

to this assertion, the record reflects that appellant objected when he did not hear some part of the proceedings clearly, and that the judge required that those portions of the proceedings be repeated for his benefit.

In *People* v. *Guillory* (1960) 178 Cal.App.2d 854, 861 [3 Cal.Rptr. 415], the court held that the trial judge must provide a defendant with a hearing impairment with reasonable assistance, within the sound discretion of the court. The defendant should also make such reasonable provisions for his own assistance as he can. Where defendant was not in custody and did not obtain batteries for his hearing aid, and where he did not object to the proceedings in the trial court, the *Guillory* court concluded that he was not denied a fair trial.

Likewise, here, appellant maintained that he did not normally need a hearing aid, and he did not object when the judge dealt with his difficulty by repeating those statements which appellant said he did not hear. From the record as a whole, it does not appear that appellant was denied a fair hearing on this ground.

Appellant contends on appeal that the judge ordered him to stay a certain distance from the witnesses, further limiting his ability to hear. This contention is supported by appellant's declaration filed in the superior court in support of his petition, but is unsupported by references to the administrative transcript. In any event, it is not alleged that appellant informed the judge that he could not hear from that distance.

B. *Discovery*

■ Appellant contends he was denied discovery because the Board did not provide him with certain documents until ordered to do so, and not until two and one-half days into the hearing.

On January 13, 1983, about one month before the hearing, a copy of all discoverable material in the Board's possession was mailed to appellant. These materials included the names and addresses of witnesses and those parts of Winston's hospital records which were in the Board's file.

On February 9, appellant was also sent a letter listing the witnesses. About a week before the hearing, the Board received a copy of the complete records of Winston at Children's Hospital in San Diego. However, these were not sent to appellant before the hearing.

Upon examining the Children's Hospital records at the beginning of the hearing on February 15, 1983, appellant said, "Some of these items I re-

ceived this package [*sic*] . . . which I imagine is the crucial stuff, but all the other stuff I never received, but I don't think the other stuff will have much to do . . . with the matter. The crucial stuff, I think they sent me . . . ."

On February 22, 1983, at the commencement of the hearing in San Diego, the Board delivered appellant a copy of the complete Children's Hospital records. Appellant did not then object to late delivery of the complete hospital records or request a continuance.

The record does not reveal, and appellant does not contend, that the Board failed to provide, or provided late, any other materials.

Discovery in this administrative hearing was governed exclusively by Government Code section 11507.6. (Gov. Code, § 11507.5.)[1]

Government Code section 11507.7 provides a remedy for failure to comply with discovery. Under that section, a party claiming denial of discovery may file a verified petition to compel discovery with the superior court, within 30 days after the request was made or 15 days after the refusal to comply. The court may then determine the matter and order production, staying the hearing if necessary.

In *Zurn Engineers* v. *State of California* ex rel. *Dept. Water Resources* (1977) 69 Cal.App.3d 798, 830-833 [138 Cal.Rptr. 478], cited by appellant, the court held that it was due process error for the state to deny to a contractor any and all access to factual matters relied upon by the state engineer in deciding the contractor's claim for payment. That case is distinguishable because in the present case, appellant received substantial discovery and received the complete hospital records while the hearing was still in progress.

Here, appellant did not specifically request a copy of the complete hospital records; request a continuance to examine the records when he received them; or file a petition to compel discovery. The hearing transcript, as set forth above, reflects that appellant actually did not consider the complete hospital records essential to his defense. Any error was waived by appel-

---

[1]Section 11507.6 provides as follows: "After initiation of a proceeding . . ., a party, upon written request made to another party, prior to the hearing and within 30 days after service by the agency of the initial pleading . . ., is entitled to (1) obtain the names and addresses of witnesses . . ., and (2) inspect and make a copy of any of the following in the possession or custody or under the control of the other party: [The statute then lists statements and reports which may be discovered.]"

lant's failure to pursue remedies before the Board. (See *Kauffman* v. *De Mutiis* (1948) 31 Cal.2d 429, 432 [189 P.2d 271].)

### C. *The Witness*

█ Appellant contends that he was denied due process of law because the Board told one witness that he did not have to appear at the time for which appellant had subpenaed him, causing appellant to become "so frustrated . . . that he did not attend the hearing the next day," contributing to the conclusion that he was irascible and not amenable to disciplinary measures short of license revocation.

Appellant subpenaed Dr. Peterson, one of the treating physicians at Children's Hospital. He believed that Dr. Peterson would testify that Winston had died of complications of adenovisus, a conclusion favorable to appellant's position. The Board also intended to call Dr. Peterson as a witness. At the hearing, appellant reaffirmed that he was going to call Dr. Peterson as a witness. The judge told appellant that Dr. Peterson would attend the hearing at state expense.

However, later during the hearing, when appellant mentioned that he intended to question Dr. Peterson, the following colloquy occurred:

"Mr. Kuperman [Deputy Attorney General]: Actually, that reminded me—[¶] I had subpoenaed Dr. Peterson. I got a call either Thursday or Friday of last week from Dr. Peterson's secretary who said that Dr. Peterson had been resubpoenaed and wondered why I did that. I explained that I didn't and asked her to look at the subpoena and she said that it had Dr. Yellen's name on it. Apparently Dr. Peterson had been subpoenaed to appear here Tuesday.

"Dr. Yellen: He's supposed to be here yesterday.

"Mr. Kuperman: I advised him since I was planning on calling him anyway and had already scheduled him to appear, that I advised him to wait until the time that I was calling him.

"Admin. Law Judge: You are gonna call him?

"Mr. Kuperman: I'm not sure at this time that I am and so I would suggest that at the point where I decide I'm not going to that I inform Dr. Yellen of that.

"Dr. Yellen: He didn't inform me of anything.

"Mr. Kuperman: And then—

"Dr. Yellen: The main witness and he won't call.

"Mr. Kuperman:—Have him make arrangements with Dr. Peterson to have Dr. Peterson testify if I'm not going to call him.

"Admin. Law Judge: All right. Do you understand that, Dr. Yellen?"

Several days later, the deputy attorney general stated that he did not intend to call Dr. Peterson, but would make him available whenever appellant desired to call him. At appellant's request, the deputy attorney general scheduled Dr. Peterson to testify on March 2, 1983, explaining that Dr. Peterson would be appellant's witness.

The following colloquy took place:

"Mr. Kuperman: Again, Dr. Peterson is not going to be my witness.

"Mr. Yellen: It's his witness. He's renegotiating. Where are those other two guys? I'm going to take them on with one hand behind my back.

"Ms. Hillock:[2] Let's get this in order.

"Mr. Yellen: I'll give them a special workover.

"Admin. Law Judge: I've gone through this before. The burden is on the agency. If they don't want to bring them in, that's their problem, except that when—

"Mr. Yellen: I want—

"Ms. Hillock: Let him talk. The judge is talking.

"Admin. Law Judge: They indicated to you that they were going to bring in certain people and they gave you notice that they would not. They had changed their minds.

"Mr. Yellen: I'm going to bring in Dr. Petersen.

"Admin. Law Judge: They are making Dr. Petersen available. You were trying to talk—

---

[2] A lay person and friend of appellant who was permitted to assist him during the hearing.

"Mr. Yellen: I'm not bringing in Dr. Petersen. What do you mean by that statement? What I mean by that, I won the case. They haven't presented any physician in the blood or urine that shows an overdose. The other guys threw it away, and these fellows won't present anything. He's got to present the evidence.

"Admin. Law Judge: That's up to him. I can't.

"Ms. Hillock: All right.

"Mr. Kuperman: Do I take it Dr. Yellen no longer wishes Dr. Petersen?

"Admin. Law Judge: Just be quiet a minute.

"Ms. Hillock: Hush, please.

"Admin. Law Judge: Just answer this yes or no. Do you want Dr. Petersen tomorrow?

"Mr. Yellen: Not my responsibility.

"Ms. Hillock: No, then I guess, then no, you don't want to question him.

"Mr. Yellen: I don't—not to come here under my auspices.

"Admin. Law Judge: Next question.

"Mr. Yellen: He wants him under his auspices, fine.

"Admin. Law Judge: All right.

"Mr. Kuperman: I will then call Dr. Petersen and advise him not to come and testify.

"Admin. Law Judge: What are we going to have for witnesses?

"Mr. Yellen: It's quits. I go home, then."

The record reflects that, rather than denying or interfering with appellant's subpena of Dr. Peterson, the deputy attorney general attempted to arrange for his presence at appellant's convenience. Appellant stated affirmatively, however, that he did not wish to put on any further defense and that he believed the Board had not made its case. He refused the offer to

obtain Dr. Peterson and abandoned the hearing by deliberately failing to thereafter appear.

Under these circumstances, appellate relief cannot be had on this issue.

D. *The Hypothetical Question*

■■ The deputy attorney general propounded a hypothetical question to the physicians called as expert witnesses. Appellant contends that the hypothetical question was misleading because it implied that the second injection, given on December 3, 1981, contained a narcotic, whereas the Board found that it contained only salicylate (aspirin).

The hypothetical read, in relevant part, as follows: ". . . . The physician gave the boy an injection containing Demerol; Chlorpromazine, Epinephrine and Sodium Salicylate. . . . [¶] On December 3, 1981, the boy was again taken to the physician . . . because of a continuation of the fever. The physician gave the boy *another injection.* Shortly after getting the injection, the boy became lethargic and sleepy, and he took a nap." (Italics added.)

The phrase, "another injection," does not necessarily imply that the second injection contained the same ingredients as the first. In fact, the second injection was specifically found by the Board to have contained only salicylates, as appellant maintained. The contents of the second injection were never disputed at the hearing.

■■ The opinion of the expert, Dr. Fred Greensite, based on the hypothetical, was that administration of *any* Demerol was not indicated in any amount, that injection of epinephrine was an unusual practice in a 16-month-old child, and use of epinephrine was not generally indicated. Dr. Greensite also testified that prescribing and injecting the combination of drugs in the hypothetical demonstrated a lack of knowledge of the current state of medical practice; and that he was of the *opinion* that there was a narcotic in the second, December 3 injection, because of the patient's reaction to it.

He also testified that on a previous occasion in his experience, he had seen a woman who fainted after appellant gave her an injection. Appellant explained that she fainted because the shot frightened her, but Dr. Greensite believed that she fainted because she was injected with narcotics. He testified that it was an extreme departure from the standard of care to fail to cooperate with a subsequently treating physician by not mentioning the administration of narcotics in Winston's case.

Dr. Nancy Powers testified that she was of the opinion that administering the combination of medications used orally and by injection was an extreme

departure from the standard of practice. Her opinion was not dependent on the contents of the second injection.

 The evidence demonstrates that the phrasing of the hypothetical question was not prejudicial to appellant.

### E. *Interested Witnesses*

 Appellant contends that the Board denied him a fair hearing because it relied on the testimony of Dr. Greensite and Dr. Powers, who were interested parties because they also treated Winston. This contention is without merit.

The credibility of witnesses is a matter for the superior court to determine in reviewing the evidence before the Board. (*Guymon* v. *Board of Accountancy* (1976) 55 Cal.App.3d 1010 [128 Cal.Rptr. 137].) This court will not disturb that determination on appeal where there was no abuse of discretion.

Moreover, regardless of whether the Board put on any "independent" witnesses (or represented to appellant that it would do so, and did not, as appellant contends), appellant was entitled to call such witnesses in his own defense. As discussed above, he declined to continue with his defense.

### F. *Denial of a Continuance*

 Appellant contends that he was deprived of due process by denial of his requests for a continuance; for additional hearing days in Brawley, where his practice was located; and for hearing days during May, when his practice would be less busy.

As the Board has pointed out, no written request for additional hearing days in Brawley appears in the record. Also, appellant has not provided a reference to the reporter's transcript where such a request was made. Rather, appellant refers to a section of the record in which appellant complains, after the hearing was convened in San Diego, that he was unable to call "10 or 15 patients" to testify that prednisone was not a harmful drug. The judge pointed out that appellant had been offered the opportunity to present certain witnesses out of order, during the Board's case, in Brawley.

When appellant again broached the issue, the judge stated that appellant had been given an opportunity to call witnesses out of order in Brawley and had called all his witnesses there. Appellant claimed he had wanted to call 15 more witnesses.

Later, when appellant again brought up the issue of additional time in Brawley, the following discussion took place between the judge and the deputy attorney general:

"[Deputy attorney general]: . . . If Dr. Yellen is requesting for hearing time in Brawley and if it's possible to arrange . . . .

"Admin. Law Judge: We'll get to that when he presents his case."

This discussion and the previous comments of the judge reveal that both the judge and the deputy attorney general were concerned with giving appellant an opportunity to present his witnesses in Brawley, if necessary, by returning there when appellant put on his case. Of course, as we have seen, appellant expressly declined to put on a further defense.

Moreover, the record reflects that in Brawley, appellant was given an opportunity to bring in his "five to ten" witnesses at 10:30 a.m. on February 16, 1983. He did so; then he said, "That's all," and indicated he had no more witnesses other than some on the deputy attorney general's list.

The record does not show that appellant was denied additional hearing days in Brawley, or was denied a necessary continuance. There is no basis for appellant's contention.

Moreover, since there was no written request for a continuance, Government Code section 11505, allowing continuances for good cause upon written request, is inapplicable.

## II. THE TRIAL COURT'S DECISION

Appellant contends that, "The trial court erred in denying the petition for writ of mandamus in that the factual findings of the trial court, affirming the Board's decision, are insufficient as a matter of law to sustain the legal conclusion that appellant was guilty of gross negligence and unprofessional conduct." Appellant further contends that the undisputed facts do not show that appellant was guilty of gross negligence or incompetence sufficient to support revocation of his license.

■ The Board is required to find by "clear and convincing" evidence that the charges could be sustained. However, the superior court, using its independent judgment, must only determine whether the Board's findings are supported by the weight of the evidence. (*Ettinger* v. *Board of Medical Quality Assurance* (1982) 135 Cal.App.3d 853, 856, 858 [185 Cal.Rptr.

601]; *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32 [112 Cal.Rptr. 805, 520 P.2d 29].)

Then, on appeal from a judgment in an administrative mandate proceeding (Code Civ. Proc., § 1094.5), this court must determine whether the superior court's findings are supported by substantial evidence and are correct on matters of law. (*Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 135 [181 Cal.Rptr. 732, 642 P.2d 792]; *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 69, 74, fn. 7 [64 Cal.Rptr. 785, 435 P.2d 553].)

Where, as here, no statement of decision was requested or made, this court must presume that the trial court found every fact necessary to support the judgment, and must affirm the judgment if correct on any ground. (*Homestead Supplies, Inc.* v. *Equitable Life Ins. Co.* (1978) 81 Cal.App.3d 978, 984 [147 Cal.Rptr. 22].)

 Business and Professions Code section 2234, which authorizes administrative action against a physician, defines "unprofessional conduct" to include "gross negligence," "repeated negligent acts," or "incompetence."

"Gross negligence" consists of a lack of even scant care *or* an extreme departure from the ordinary standard of conduct. (*Gore* v. *Board of Medical Quality Assurance* (1980) 110 Cal.App.3d 184, 195-198 [167 Cal.Rptr. 881].)

Two doctors testified at the hearing that appellant's treatment of Winston was an extreme departure from the standard of practice. Dr. Greensite testified that "the array of medications that were given to this child without any apparent indication" was his main reason for reaching that conclusion, combined with the lack of advice from appellant to increase the child's fluid intake. Dr. Greensite felt that some of the drugs were contraindicated and some were useless. His opinion was that the array of drugs used, and the injection, showed a lack of knowledge of the current state of medical practice.

Dr. Powers also testified that the injection and oral medication given to Winston were an extreme departure from the standard of practice and dangerous.

This testimony provided substantial evidence to support the judgment of the superior court.

### III. The Penalty

Appellant contends that the Board abused its discretion in permanently revoking his license, because: (1) Respondent based the penalty on the finding that appellant's personality was "irascible," due to his failure to attend the last part of the hearing; and (2) the Board disregarded Business and Professions Code section 2229, which requires rehabilitation of licensees whenever possible.

■ It is true, as appellant contends, that hospital staff privileges may not be denied on the grounds of general unsuitability, "ability to work with others," or personality traits, unless there is some nexus between the personality trait and the quality of medical services provided. (See *Miller* v. *Eisenhower Medical Center* (1980) 27 Cal.3d 614 [166 Cal.Rptr. 826, 614 P.2d 258]; *Rosner* v. *Eden Township Hospital Dist.* (1962) 58 Cal.2d 592 [25 Cal.Rptr. 551, 375 P.2d 431].)

■ However, in the present case, the Board's finding of gross negligence and incompetence was expressly based on appellant's practice of injecting and prescribing medications which were medically inappropriate and dangerous. The Board further expressly found that the medications given to Winston had been administered to others on many occasions. This finding was supported by appellant's own admission, thus demonstrating repeated acts of medically inappropriate and dangerous conduct.

There was substantial evidence to support these findings. Appellant testified that he usually gives a child with a fever a shot of salicylate; that he frequently prescribes prednisolone, a corticosteroid, phenylpropanolamine, opium and morphine to children less than two years old. Drs. Greensite and Powers testified that these treatments were outdated or dangerous and were an extreme departure from the current standard of practice.

Appellant's "irascible" personality, and the fact that he continued to insist that his injections and prescriptions were proper, provide the basis for the Board's decision to revoke appellant's license, rather than imposing suspension or supervised practice.

■ As the Board has pointed out, even in a criminal proceeding, the court may take into account the defendant's attitude toward the offense and his character as evidenced by his behavior and demeanor at trial. (Cal. Rules of Court, rule 414; *People* v. *Fowler* (1980) 109 Cal.App.3d 557, 565-566 [167 Cal.Rptr. 235], disapproved on another point in *People* v. *Humphrey* (1982) 138 Cal.App.3d 881 [188 Cal.Rptr. 473].) Since consideration of such factors does not offend due process in criminal proceedings, it follows

that the Board does not abuse its discretion by considering these factors in determining what discipline to impose.

 In the writ proceeding, the court had before it the administrative record, from which it is clear that appellant frequently argued with and became abusive toward the witnesses, to the point of approaching them, threatening them, and yelling at them. Appellant never retreated from the opinion that his injections and prescriptions were proper, despite persuasive contrary opinion on the accepted standards of practice.

Lastly, the court also had before it the declarations of Daniel H. Latendresse, James Gordon Birdsong, and Kevin J. Armentano, showing that appellant had violated the terms of the temporary stay of his revocation originally granted by the superior court, by continuing to write prescriptions requiring compounding by the pharmacist and continuing to administer injections. Thus, the court's implied finding, that the Board had not abused its discretion in declining to place appellant on probation with limited practice, was supported by substantial evidence.

 Appellant's contention that the superior court erroneously determined that it could not remand the case to the Board for reconsideration of penalty is misplaced. The record of the hearing on the writ petition reflects that the court sustained the penalty of revocation as a matter vested in the discretion of the Board. Its decision may not be disturbed unless there has been a manifest abuse of discretion. That was the correct standard. (See *Cadilla* v. *Board of Medical Examiners* (1972) 26 Cal.App.3d 961, 966 [103 Cal.Rptr. 455].)

DISPOSITION

The judgment is affirmed.

McClosky, Acting P. J., and Fields, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.