[No. B158358. Second Dist., Div. Seven. Apr. 7, 2003.]

SYBIL MORRISON, Plaintiff and Appellant, v.
HOUSING AUTHORITY OF THE CITY OF LOS ANGELES BOARD
OF COMMISSIONERS, Defendant and Respondent.

862

**COUNSEL**

Rothner, Segall & Greenstone, Anthony R. Segall and Emma Leheny for Plaintiff and Appellant.

Pilar Morin, Libert, Cassidy & Whitmore, Melanie Poturica and Nathan Kowalski for Defendant and Respondent.

**OPINION**

**JOHNSON, J.**—Appellant Sybil Morrison brought an action for administrative mandamus to set aside the decision by the Board of Commissioners of the Housing Authority of the City of Los Angeles (commissioners) upholding her termination from employment. She also sought a declaration the commissioners violated the Ralph M. Brown Act by hearing the charges against her in closed session, and an injunction requiring appeals from employee discipline be considered in open session at the employee's request. The trial court denied all relief and Morrison filed a timely appeal. For the reasons explained in part II below, we reverse.

### FACTS AND PROCEEDINGS BELOW

Morrison was first employed by the Housing Authority of the City of Los Angeles (HACLA) as an eligibility interviewer from 1976 to 1979. She

returned to the agency as a "Section 8" adviser in 1994 and served in that position until her termination in 1999.[1] Morrison met Mario Campana when they worked together as Section 8 advisers for approximately five months in 1994. Campana subsequently returned to his regular position as an eligibility interviewer in a different building. During the next five years Morrison saw Campana five or six times when he had occasion to be in the building where she worked.

In June 1999, Campana approached Morrison at her workstation. He asked Morrison to use her computer to access the files of three public housing tenants and provide him with hard copies, which she did. Morrison did not verify Campana was still an HACLA employee; did not ask him why he did not access the files himself; and did not ask him why he wanted the information. In fact, Campana had been terminated by HACLA the previous year for soliciting sex from female applicants for public housing. He was in the building where Morrison worked to attend a hearing on his discharge. The files Campana asked Morrison to access were those of the complaining witnesses and contained their names, addresses, Social Security numbers, income and immigration status. Campana introduced these files into evidence at his hearing. As a result, HACLA was able to establish Morrison was the source of the information.

HACLA launched an investigation to determine how Campana had obtained the files off Morrison's computer. Morrison admitted to the investigator she had given Campana the files at his request. The following colloquy took place between the investigator and Morrison.

"Q. Do you know what reason, purpose [Campana] was in the office on that day?

"A. For a hearing."

In addition, Morrison told the investigator she did not believe the information she gave Campana was confidential and "I would not have done it had I thought that way."

At the conclusion of its investigation HACLA terminated Morrison for providing confidential tenant information to someone she "knew . . . was no longer an employee of the Housing Authority and . . . had no legitimate Authority-related business need for this information." This breach of confidentiality had serious consequences, HACLA asserted. Because the tenants

---

[1] "Section 8" is a federal program administered by the Department of Housing and Urban Development (HUD) which provides financial assistance to low-income tenants. The program is operated on the local level by public housing authorities such as HACLA.

were reluctant to testify against Campana for fear of retaliation, HACLA had promised them Campana did not know where they lived and had no means of accessing this information. As a result of Morrison giving Campana the tenants' addresses and other confidential information, HACLA had to relocate them to protect their safety. Morrison's action also subjected HACLA to HUD sanctions and civil liability to the tenants for invasion of privacy. HACLA cited as its authority for terminating Morrison personnel rule 108:0903(a): "Incompetency, inefficiency, insubordination, discourteous treatment to the public or fellow employees, or any other adverse failure of personal conduct which is in conflict with or otherwise adversely affects the best interest of [HACLA]."

Morrison appealed her termination to the commissioners. The commissioners appointed a hearing officer to take evidence and make a recommendation on her appeal.

At the hearing, Morrison denied she knew Campana was no longer an HACLA employee at the time he requested the tenant files. She testified she only learned of his termination and the reason for his presence in her office several months later when informed by her attorney in preparation for her meeting with the HACLA investigator. She contended that when the investigator asked her "*do* you know [the reason Campana] was in the office on that day?" she answered "for a hearing" on the basis of her present knowledge, not on the basis of what she knew on the day she gave Campana the files.

Although Morrison told the HACLA investigator she did not believe the information she gave Campana was confidential, at the hearing she testified she understood the information was confidential "but that wouldn't have made a difference" because she believed at the time Campana was still an HACLA employee. "When I gave the information to Mr. Campana," Morrison stated, "I thought he was still employed by the Housing Authority. He had the right to have that information; therefore, there wasn't a breach of confidentiality."

Morrison admitted at the hearing that during the time HACLA was considering Campana's appeal from his termination she was treasurer of the union to which Campana belonged, she attended bimonthly union executive committee meetings and her workstation was next to the one occupied by the president of the union. It was also established at the hearing Campana was represented by the union on his appeal. Nevertheless, Morrison emphatically denied learning of Campana's termination through her union contacts and denied the subject of Campana's termination and appeal was discussed at union meetings she attended.

HACLA presented evidence to rebut Morrison's claim sharing the tenants' files with Campana would not have been a breach of confidentiality if Campana had still been employed as an eligibility interviewer.

An HACLA official "familiar with the [agency's] computerized data base as well as the rules that govern its use" testified: "The [tenants'] accounts contain confidential information about the applicant or tenant such as their address, criminal record and social security number. . . . There are two criteria that govern the viewing, printing or use of these documents. The employee must be authorized to perform these acts; and the employee must have a business purpose for doing so. Employees are advised of these limitations when they are trained on the computer system."

The assistant director for Section 8 housing testified the Section 8 department where Morrison worked and the conventional public housing department where Campana worked were separate departments operating separate programs and she could not think of a legitimate business reason why a Section 8 adviser would access confidential client information from the public housing department and share it with another employee.

The hearing officer found Morrison to be "a credible witness" and accepted her explanation for the apparent conflict between her statement to the investigator and her testimony at the hearing regarding whether she knew Campana was no longer an HACLA employee when she gave him the tenants' files. The officer concluded HACLA "failed to prove appellant willfully gave confidential information to a former co-employee for use in defense of his discharge." Morrison was not completely absolved of blame, however. The officer concluded Morrison was negligent in sharing confidential information with a person from a different department, in a different building, with no apparent authority or need for the information. Based on Morrison's long service and discipline-free record the hearing officer found discharge was too severe a punishment for this instance of negligence and recommended a one-week suspension without pay.

The commissioners did not accept the hearing officer's findings or recommendations. Instead, based on their own review of the evidence the commissioners found "Ms. Morrison knew at the time she provided the information to Mr. Campana that he had been terminated and was at the [agency] for his own arbitration." The commissioners further found "[r]egardless of whether Ms. Morrison knew that Mr. Campana had been terminated, she knew that he worked in the application center, which is a different department and had no business with this information . . . ." Based on these findings the commissioners sustained Morrison's termination from employment.

Morrison then brought this suit against the commissioners. In her first cause of action for administrative mandamus she alleges the commissioners abused their discretion in upholding her termination because they failed to proceed in the manner required by law,[2] their decision is not supported by their findings and their findings are not supported by the evidence. In her second cause of action for declaratory and injunctive relief she alleges the commissioners, in considering her appeal, violated the Brown Act by conducting closed sessions without giving her the required notice, failing to advise her of her right to an open hearing and failing to conduct an open hearing on her appeal. She seeks an injunction restraining the commissioners from engaging in such conduct in the future.

The trial court exercised its independent judgment on the administrative record and concluded the weight of the evidence supported the commissioners' finding Morrison knew Campana had been terminated from his employment at HACLA when she gave him the confidential tenant information. The court did not address the commissioners' alternative ground for discharging Morrison: that the confidential tenant information should not have been shared with Campana even if he was still employed by HACLA. On the Brown Act cause of action, the trial court granted summary adjudication to the commissioners on the ground the act's open meeting provisions did not apply to Morrison's appeal and, in any event, the commissioners did not make their final decision on the appeal until after considering the matter at an open meeting in which they heard argument from the agency and Morrison. Following these rulings, the trial court entered judgment for the commissioners.

We reverse. Although there is substantial evidence to support the trial court's findings in support of the commissioners' determination, that determination was fundamentally flawed because the commissioners made it in meetings which violated the Brown Act.

## DISCUSSION

I. *Substantial Evidence Supports the Trial Court's Finding Morrison Knew Campana Had Been Terminated from His Employment at HACLA When She Gave Him Confidential Tenant Information.*

The trial court properly exercised its independent judgment to determine whether the weight of the evidence presented at Morrison's

---

[2]This claim is based on the commissioners' alleged violation of the Ralph M. Brown Act (Gov. Code, § 54950 et seq., Brown Act.) discussed in part II below.

hearing supported the commissioners' decision upholding her discharge from employment.[3] In exercising its independent judgment the trial court had the power to draw its own reasonable inferences from the evidence and to make its own determinations as to the credibility of the witnesses.[4] Thus, the trial court was not bound by the inferences drawn by the hearing officer nor by his determination Morrison was a "credible" witness. ■ On appeal from the trial court's judgment our review is limited to the question whether the trial court's findings are supported by substantial evidence.[5] Where the evidence supports more than one reasonable inference, we are not at liberty to substitute our deductions for those of the trial court.[6] Given this very narrow standard of review, we cannot say there is a basis for reversing the trial court's judgment.

■ The trial court found "Morrison knew, at the time she provided the information to Campana, that he had been terminated and that he was at the Authority for his own arbitration." In order to make this finding the trial court first had to disbelieve Morrison's testimony to the contrary.

■ Although the trial court has discretion to make its own credibility determinations,[7] as with any other exercise of discretion the court cannot act arbitrarily or capriciously; there must be some basis in the record for disbelieving the witness's testimony.[8] We cannot say the trial court abused its discretion in disregarding Morrison's testimony.

Factors which weigh on the credibility of a witness include the "existence . . . of a bias, interest, or other motive" and the making of a statement "inconsistent with [the witness's] testimony at the hearing."[9] ■ Morrison obviously had an interest and motive in denying she knew Campana had been terminated from his employment at HACLA when she gave him confidential tenant information. In addition, Morrison changed her position on the confidentiality of the information she gave Campana. In her interview with the HACLA investigator she stated she did not believe the information she gave Campana was confidential. At the hearing she testified she knew the information was confidential at the time she gave it to Campana. In addition, the evidence showed sources of information about

---

[3] *Schmitt v. City of Rialto* (1985) 164 Cal.App.3d 494, 500 [210 Cal.Rptr. 788].

[4] *Guymon v. Board of Accountancy* (1976) 55 Cal.App.3d 1010, 1016 [128 Cal.Rptr. 137].

[5] *Valiyee v. Department of Motor Vehicles* (1999) 74 Cal.App.4th 1026, 1031 [88 Cal.Rptr.2d 508].

[6] *Robertson v. Zolin* (1996) 44 Cal.App.4th 147, 152 [51 Cal.Rptr.2d 420].

[7] *Guymon v. Board of Accountancy, supra,* 55 Cal.App.3d at page 1016.

[8] *Yellen v. Board of Medical Quality Assurance* (1985) 174 Cal.App.3d 1040, 1056 [220 Cal.Rptr. 426].

[9] Evidence Code section 780, subdivisions (f), (h).

Campana's termination were available to Morrison through her position as a union official and her relationship to the union president. Alone, Morrison's self-interest and motive in denying any knowledge of Campana's termination would not be a sufficient ground for doubting her truthfulness. But with the added facts Morrison changed her testimony regarding her knowledge the tenant files were confidential and Morrison had access to information about Campana's discharge through her union contacts, the trial court could reasonably doubt Morrison's credibility when she denied any knowledge of Campana's discharge or his pending appeal.

Of course, the absence of credible evidence Morrison did *not* know of Campana's discharge and appeal when she gave him the files does not prove she *did* know. The trial court found Morrison knew Campana was appealing his termination from employment when she gave him the tenants' files based on the following evidence. Morrison met Campana five years earlier when they both worked as Section 8 advisers and Campana sat in the cubicle next to her. In the intervening years Morrison saw Campana on five or six occasions when he visited the building where Morrison worked. On the day in question Campana briefly visited with Morrison at her workstation and asked her to retrieve files from her computer on three female public housing tenants. Morrison knew these files were confidential but nonetheless failed to question Campana's need for the information or why he did not retrieve the information himself.[10] During her interview with the HACLA investigator, Morrison stated she knew Campana was in the building to attend "a hearing."

Although it is a close question, we conclude there is sufficient evidence to logically and reasonably support an inference Morrison knew Campana was no longer an HACLA employee when she gave him the confidential tenant information. Morrison and Campana once worked side by side as Section 8 advisers and had continued personal contact in the ensuing years. Morrison was an official in the union representing Campana in his appeal from his discharge, attended bimonthly union meetings where his appeal could have been discussed and worked in the cubicle next to the president of the union who, it is reasonable to presume, must have known of Campana's situation. The fact Morrison did not question Campana about why he needed the tenant information or why he came to her for it suggests Morrison already knew the answer—Campana could not gain access to the information himself because he no longer worked for the agency. Morrison's statement to the HACLA

---

[10]The trial court found "[a] reasonable inference can be made that Morrison failed to question Campana's need for the information because Morrison knew that Campana needed the information with regard to his [employment] arbitration hearing."

investigator she knew Campana was in the building "for a hearing" was ambiguous because it is not clear from the investigator's question and Morrison's response exactly when she acquired this knowledge; nevertheless it is additional evidence the trial court was entitled to consider.

Admittedly, this same evidence could be viewed as not logically and reasonably leading to an inference Morrison knew about Campana's firing and appeal. Would a woman who knew a male employee had been fired for soliciting sex from female applicants for public housing hand over without hesitation confidential information about the alleged victims to the accused ex-employee? Would it not be more rational to infer she provided the information as an accommodation to a person she believed to be a fellow employee? Would a union president who knows about a member's firing and pending appeal share that information with the union treasurer who has no role in either the firing or the appeal?

Nevertheless, because the trial court could reasonably and logically reach the inference it did, it is not within our purview to reverse the court's judgment.

II. *The Commissioners Violated the Brown Act by Conducting a Closed Hearing on the Charges Against Morrison Without Giving Her Notice of the Right to Be Heard in Person in an Open Session.*

 As a general rule, the business of an agency such as HACLA must be conducted in the open at public meetings.[11] An exception and an exception to the exception exist, however, for certain personnel matters. Under section 54957, subdivision (b)(1) a public agency may hold a closed session "to consider . . . discipline, or dismissal of a public employee *or* to hear complaints or charges brought against the employee by another person or employee *unless the employee requests a public session.*" (Italics added.) To effectuate the employee's right to a public hearing subdivision (b)(2) provides: "As a condition to holding a closed session on *specific complaints or charges* brought against an employee by another person or employee, the employee shall be given written notice of his or her right to have the complaints or charges heard in an open session rather than a closed session, which notice shall be delivered to the employee personally or by mail at least 24 hours before the time for holding the session." (Italics added.) Subdivision (b)(2) goes on to state if the required notice is not given "any disciplinary or other action taken by the [agency] against the employee

[11]Government Code *sections 54950, 54953.* All future statutory references are to the Government Code.

based on the specific complaints or charges in the closed session shall be null and void."

In the case before us, the commissioners met in closed session on February 23, 2001 "to discuss findings of arbitrator regarding the discharge of Sybil Morrison." The commissioners gave a general public notice of this meeting but did not personally serve advance notice to Morrison of her right to demand an open session. The minutes of the commissioners' meeting state they "took no action . . . with regard to the Sybil Morrison matter."

In April 2001 the commissioners sent a letter to Morrison's attorney informing him they intended to meet "to make a final determination in the matter of Sybil Morrison." The letter did not state whether the meeting would be open or closed nor did it state whether Morrison would be allowed to testify or her counsel allowed to speak. The public notice of the meeting, however, stated the commissioners would "meet in closed session, with legal counsel, to discuss findings of [the] arbitrator regarding the discharge of Sybil Morrison." Morrison's attorney appeared at the time and place of the meeting and requested the commissioners conduct their deliberations in open session. The commissioners tabled discussion of Morrison's case in order to consult with their attorney on the open meeting issue.

The following month the commissioners wrote to Morrison's attorney advising him they would "meet in open session to make a determination in the matter of Sybil Morrison." Once more, the letter did not state whether Morrison or her attorney would be heard at the meeting. The public notice of the meeting stated the commissioners would meet in open session to discuss "possible action with regard to the Sybil Morrison matter" and in closed session "to consider the discipline and/or dismissal of Sybil Morrison."

The commissioners met as scheduled and considered the entire matter in open session including the issue of Morrison's discipline or dismissal. They heard extensive argument from attorneys for the housing authority management and Morrison as to why they should or should not adopt the hearing officer's findings and recommendations. Morrison was not present. Her attorney explained "it wasn't clear that she would be allowed to speak [and] she really felt there was no role for her . . . ." The commission chairperson stated if Morrison had been present "we would have been glad to listen to her."

After hearing argument and asking questions of both counsel and expressing their own views on the matter the commissioners voted four to one to adopt a resolution setting aside the findings and recommendations of the hearing officer and upholding Morrison's discharge from employment.

■ As previously noted, section 54957, subdivision (b)(1) provides a public agency may hold a closed session "to hear complaints or charges brought against the employee." Previous appellate court decisions have interpreted the phrase "complaints or charges" to refer to accusations against an employee.[12]

In the context of employee discipline, previous cases have distinguished between meetings to hear complaints and charges against an employee and meetings to consider whether those complaints and charges justify dismissal or other disciplinary action. For purposes of section 54957, the courts have held the notice under subdivision (b)(2) is not required when an agency proposes to "consider" in closed session whether charges or complaints against an employee justify dismissal. If, however, the agency proposes to "*hear*" the charges or complaints in closed session it must give the employee notice of the right to demand an open session.[13]

■ Therefore, the principal question we must decide in this case is whether the commissioners conducted a "hear[ing]" on "charges brought against [an] employee," within the meaning of section 54957, subdivision (b)(1) when they rejected the hearing officer's findings of fact and reviewed the evidence themselves. If so, then under the plain language of subdivision (b)(2) Morrison was entitled to be served with at least 24 hours' advance written notice "of . . . her right to have the complaints or charges heard in an open session rather than a closed session" and the commissions' failure to provide such notice renders its decision upholding her discharge "null and void."[14]

Neither party has cited, nor have we found, a case directly on point. Nevertheless, we are not without guidance in deciding what it means to "hear complaints or charges" under section 54957.

■ Our foremost guidance lies in the language and intent of the Brown Act. In section 54950 the Legislature declared: "It is the intent of [this] law"

---

[12]See e.g., *Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 683 [98 Cal.Rptr.2d 263].

[13]*Bell v. Vista Unified School Dist., supra*, 82 Cal.App.4th 672, 682; *Bollinger v. San Diego Civil Service Com.* (1999) 71 Cal.App.4th 568, 574-575 [84 Cal.Rptr.2d 27]; and see *Caloca v. County of San Diego* (2002) 102 Cal.App.4th 433, 446, footnote 3 [126 Cal.Rptr.2d 3]. Because the notice requirement undisputedly applies when the agency conducts a hearing on complaints or charges against an employee, we need not decide in this case whether it also applies when the agency limits its deliberations to whether charges or complaints previously established justify dismissal or discipline. See *Fischer v. Los Angeles Unified School Dist.* (1999) 70 Cal.App.4th 87, 96-97 [82 Cal.Rptr.2d 452].

[14]Section 54957, subdivision (b)(2); and see cases cited in footnote 13, *ante*.

the actions of public agencies "be taken openly and that their deliberations be conducted openly." Courts have taken this to mean the Brown Act should be "construed liberally in favor of openness" and the "exceptions authorizing closed sessions . . . construed narrowly."[15] With respect to the exception for closed sessions in personnel matters, the courts have agreed the " 'underlying purposes of the "personnel exception" are to protect the employee from public embarrassment and to permit free and candid discussions of personnel matters by a local governmental body." ' "[16]

 It is entirely consistent with the language and intent of the Brown Act to construe as a "hearing" under section 54957 a meeting in which the agency, having rejected the hearing officer's report and recommendations, engages in its own factfinding proceeding.

*Bell v. Vista Unified School Dist.* illustrates how a closed session to consider employee discipline can evolve into a hearing on a complaint or charge in which the employee is entitled to notice and the opportunity to request an open hearing. In *Bell*, the high school football coach was found by the California Interscholastic Federation (CIF) to have violated CIF rules in arranging the immigration and housing of an Australian high school student. The CIF imposed a period of ineligibility on the student, placed the school's athletic program on probation and suspended its CIF membership for a year. The CIF took no action against Coach Bell but ordered the school to review the matter and take whatever action against him it deemed appropriate.[17] The school board held a closed session to consider what action to take in response to the CIF probation. It posted public notice of the meeting describing the subjects to be considered including " 'public employee discipline/dismissal/release.' " The board did not give Bell 24 hours' notice of the meeting and he did not attend.[18] At the closed meeting school administrators presented to the board the CIF's finding Bell had violated CIF rules. The board considered what action to take against Bell without the benefit of a written transcript of the CIF hearing, relying instead on the representations of the school administrators. The board voted to permanently remove Bell as football coach.[19] In Bell's subsequent action against the school the trial court declared the board's action null and void for violation of the Brown Act.[20]

[15]*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 917 [117 Cal.Rptr.2d 631].
[16]*Bollinger v. San Diego Civil Service Com., supra,* 71 Cal.App.4th at page 573.
[17]*Bell v. Vista Unified School Dist., supra,* 82 Cal.App.4th at page 679.
[18]*Bell v. Vista Unified School Dist., supra,* 82 Cal.App.4th at page 679.
[19]*Bell v. Vista Unified School Dist., supra,* 82 Cal.App.4th at page 679.
[20]*Bell v. Vista Unified School Dist., supra,* 82 Cal.App.4th at page 680.

The Court of Appeal affirmed. The court held "the CIF finding that Bell had violated CIF rule 510 . . . upon presentation to the Board evolved into a 'complaint or charge' brought by other employees . . . ."[21] The court explained once the school administrators presented the CIF finding to the board as a basis for disciplining Bell, "that finding essentially became an accusation—an indictment brought against him with potential disciplinary consequences."[22] Consequently, "Bell was entitled to the opportunity to respond to it, so as to put it in proper factual context, to clear his name and to avoid imposition of discipline."[23] Significant to the case before us, the court in *Bell* reasoned the proceeding before the school board was a "hearing" on a complaint and not merely a meeting to consider whether discipline should be imposed on Bell because the board did not simply review a transcript of the CIF hearing but independently considered the evidence presented by school administrators to which Bell had no opportunity to respond. Furthermore, the focus of the CIF hearing was on the student's eligibility, not on whether Bell's conduct warranted discipline by the board.[24] In order to impose the discipline it did, the board had to independently evaluate the charge made by the school administrators based on the CIF finding. "Under such circumstances," the court reasoned, "Bell should have been afforded the opportunity to present his version of the facts regarding his role and the roles of other . . . employees, including those who directly and indirectly presented the CIF finding to the Board. Only within that context could the Board meaningfully evaluate the complaint or charge and, if necessary, later decide upon appropriate discipline."[25]

Under their contract with Morrison's union the commissioners could have elected to hear Morrison's appeal themselves rather than referring it to a hearing officer for an advisory report. Had they chosen initially to hear the appeal themselves, it is beyond dispute Morrison would have had the right to demand an open proceeding under section 54957, subdivision (b)(2) because the commissioners were acting under subdivision (b)(1) to "hear complaints or charges brought against [an] employee by another person or employee."[26] We see no reason why the result should be any different when the commissioners, having initially opted to employ an independent hearing officer, decide to reject the hearing officer's findings as to the facts and the credibility of the witnesses and make their own factual findings and credibility determinations. This is particularly true where, as here, the hearing

---

[21]*Bell v. Vista Unified School Dist., supra,* 82 Cal.App.4th at page 683.

[22]*Bell v. Vista Unified School Dist., supra,* 82 Cal.App.4th at page 683.

[23]*Bell v. Vista Unified School Dist., supra,* 82 Cal.App.4th at page 683.

[24]*Bell v. Vista Unified School Dist., supra,* 82 Cal.App.4th at page 683.

[25]*Bell v. Vista Unified School Dist., supra,* 82 Cal.App.4th at pages 683-684, footnote omitted.

[26]*Bollinger v. San Diego Civil Service Com., supra,* 71 Cal.App.4th at page 574.

officer had found the main charge against Morrison to be without merit—so to impose the discipline they did the commissioners had to evaluate the charges and find valid a charge the hearing officer rejected. Here the commissioners not only inserted themselves into the shoes of the hearing officer, they walked in the exact opposite direction.

The result we reach is in accord with the Legislative intent the "deliberations" of a public agency "be conducted openly."[27] The term "deliberation" has been broadly construed to connote " 'not only collective discussion, but the collective acquisition and exchange of facts preliminary to the ultimate decision.' . . ."[28] In making its own evaluation of the complaint against Morrison based on the record, the commissioners engaged in a "collective acquisition and exchange of facts" within the meaning of section 54950.

■ Finally, requiring the commissioners' fact finding to be conducted openly upon the demand of the employee is consistent with maintaining the three-way balance the Legislature sought to achieve between the public's interest in "remaining informed" and "retain[ing] control over the instruments [it] created,"[29] the agency's interest in being able to discuss personnel matters "freely and candidly in closed session," and the employee's interest in "an open session to defend against specific complaints or charges . . . and thus to clear his or her name. . . ."[30] It has long been the law of this state that "the people have the right to know what is done in their courts."[31] The Brown Act applies this principle to proceedings by public agencies. The interests of the public and the accused employee in a public hearing are much the same as the interests of the public and an accused criminal in a public trial; that the public may see the employee receives a fair hearing and is not unjustly disciplined based on the evidence; and that the presence of interested spectators keep the triers of fact alive to a sense of their responsibility and to the importance of their function.[32] In addition, as previously mentioned, the accused employee may wish to publicly clear her name. In the employee discipline context, the value competing against the public's "right to know what is going on" is not a right to take evidence in secret,[33] but the need for free and candid discussion of the action the agency should

---

[27]Section 54950.

[28]*Rowen v. Santa Clara Unified School Dist.* (1981) 121 Cal.App.3d 231, 234 [175 Cal.Rptr. 292], citation omitted.

[29]Section 54950.

[30]*Bell v. Vista Unified School Dist.*, *supra*, 82 Cal.App.4th at page 682, citation omitted.

[31]*In re Shortridge* (1893) 99 Cal. 526, 530 [34 P. 227].

[32]See *People v. Woodward* (1992) 4 Cal.4th 376, 385 [14 Cal.Rptr.2d 434, 841 P.2d 954].

[33]A separate exception to the open meeting requirement exists with respect to matters posing a risk to public safety and security. Section 54957, subdivision (a).

take in light of that evidence. As one commentator has noted, "it makes a good deal of sense for any governmental body to retain a zone of privacy within which its members can air internal disagreements."[34]

■ Having determined the Brown Act required the commissioners to conduct their fact finding in open session at Morrison's request, we conclude the commissioners violated the act when they failed to do so.

The commissioners met in closed session February 23, 2001 "to discuss findings of arbitrator regarding the discharge of Sybil Morrison" without giving Morrison the required 24-hour advance notice of her right to demand an open session. Although the minutes of the commissioners' meeting state they "took no action" with regard to Morrison's appeal, this simply reflects the fact the commissioners did not reach a decision on the appeal at that meeting. A letter from the commissioners to Morrison confirmed "[a]t its meeting on February 23, 2001, the Board had *reviewed the record and discussed the matter in closed session,* but reached no final decision and took no final action." (Italics added.) The fact the commissioners gave Morrison notice of a subsequent meeting "to make a determination in the matter" and held such meeting in public at her request does not cure the previous violation. To hold otherwise would eviscerate the Brown Act because it would allow the agency to make finding of fact in secret which ought to be made in public and then conduct a mere "ceremonial" hearing to satisfy the open meeting requirement.[35] It is the job of the courts in enforcing the Brown Act to block, not facilitate, such evasive techniques.[36]

In summary, where the governing body of a public entity, in a case involving employee discipline, rejects its hearing officer's findings of fact and engages in its own fact finding it is conducting a "hearing" on the charges against the employee for purposes of section 54957 and the employee must be given notice of the right to have the hearing conducted in open session. The commissioners' failure to give the required notice in this case renders their decision upholding Morrison's discharge "null and void" and the trial court erred in denying her petition for administrative mandamus.[37]

Upon remand, the commissioners may adopt the hearing officer's findings of fact or they may substitute their own evidentiary findings after a hearing

[34]Wickham, *Let the Sun Shine in!* (1973) 68 Nw. U. L.Rev. 480, 481.

[35]See *Sacramento Newspaper Guild v. Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 50 [69 Cal.Rptr. 480].

[36]*Sacramento Newspaper Guild v. Sacramento County Bd. of Suprs., supra,* 263 Cal.App.2d at page 50.

[37]Section 54957, subdivision (b)(2); Code of Civil Procedure section 1094.5, subdivision (b). There is no merit to the commissioners' contention section 54960.1, subdivision (b)

held in conformity with the notice requirements of section 54957, subdivision (b). We need not decide the procedural features of such a hearing at this juncture. The commissioners have already stated Morrison is entitled to personally address them on such issues as her credibility and her knowledge at the time she gave the confidential information to Campana. Due process considerations aside, we believe the opportunity to address the decision makers personally is inherent in the employee's right "to request an open session . . . to clear his or her name."[38]

## DISPOSITION

The judgment for respondent on the cause of action for injunctive and declaratory relief is reversed. The judgment for respondent on the cause of action for a writ of administrative mandamus is reversed and the trial court is directed to issue a writ commanding respondent to set aside its decision upholding appellant's discharge, to reconsider the case in the light of this opinion, and to take such further action as the trial court deems just and proper under the law. Appellant is awarded her costs on appeal.

Perluss, P. J., and Woods, J., concurred.

---

required Morrison to demand they "cure or correct" their challenged decision before bringing this action. By its terms, section 54960.1 does not apply to actions taken in violation of section 54957. *Bell v. Vista Unified School Dist.* does not hold to the contrary. The failure to demand the defendant cure or correct its action was not at issue in *Bell*. (*Bell v. Vista Unified School Dist.*, *supra*, 82 Cal.App.4th at pp. 684-685.)

[38]*Bell v. Vista Unified School Dist.*, *supra*, 82 Cal.App.4th at page 682 and see *id.* at page 683.