Filed 1/20/21  Duncan v. Duncan Kitchen Grips, Inc. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ROBIN DUNCAN, | |
| Plaintiff and Respondent, | G058510 |
| v. | (Super. Ct. No. 30-2014-00757889) |
| DUNCAN KITCHEN GRIPS, INC., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James L. Crandall, Judge.  Affirmed in part, reversed in part and remanded.

Fox Rothschild, John Shaeffer and Jeffrey Grant for Defendant and Appellant.

Law Office of Martin N. Buchanan and Martin N. Buchanan; Girardi|Keese and Christopher T. Aumais; Good Law and Christopher B. Good for Plaintiff and Respondent.

# INTRODUCTION

For legitimate reasons, businesses often adopt a default position of secrecy when it comes to producing or handing over their internal corporate data, especially in litigation. There is always a quite reasonable concern that valuable information could fall into the hands of competitors and weaken or even destroy one's position in the marketplace. But as this case demonstrates, secrecy can sometimes backfire. Here, it backfired in dramatic fashion when a corporate defendant's lack of transparency in its contractual dealings with the plaintiff led to litigation. The defendant's continued resistance to sharing information in discovery ultimately diminished its credibility before the trial court, resulting in an adverse judgment. Credibility, once lost, cannot be restored to a litigant on appeal, and although we reverse and remand the trial court's damages calculation, we largely affirm its judgment.

# FACTS

*Background*

Respondent Robin Duncan started a manufacturing business with her husband, David, in the 1990's. The two initially started out making grips for tool handles, but they eventually migrated into the kitchen utensil market, producing neoprene oven mitts and hot pads in conjunction with the makers of the famous George Foreman grill. One of the Duncans' customers was a Canadian food services conglomerate, Browne & Company (Browne), owned and operated by cousins Michael and Peter Browne.[1] Browne became a distributor of Duncan products in the 1990's.

The Duncans' business grew and prospered until David's[2] unexpected death in August 2007. While David was alive, he and Robin handled all of the business

---

[1] To avoid confusion with their company, we will refer to Michael and Peter Browne by their full names when we discuss them individually. To the extent we refer to them as a pair, we shall use the designation "the Brownes."

[2] We refer to the respondent and her late husband by their first names only to more easily differentiate them from one another. We mean no disrespect or familiarity in doing so.

operations themselves, from design to sales. They also managed the books themselves. Robin was mostly responsible for purchasing and maintaining company insurance, even when David was alive. However, after David died, all the work of the business fell on her shoulders.

Sometime in 2008, Robin decided she could no longer manage the business on her own. She approached Browne to explore a potential sale. Interested, the Brownes tasked their then-chief financial officer, Anthony Carter, with the job of conducting due diligence and hammering out a deal with Robin. While Peter Browne may have had some initial involvement, the deal was mostly handled by Carter.[3]

In reality, "due diligence" seems to have been too ambitious a phrase. To hear Robin tell it, she gave Browne access to all her books and records as well as her facilities. She says there is nothing she did not give them permission to see. But from Carter's point of view, due diligence consisted of little more than him touring the Duncans' Tustin manufacturing plant. He felt Browne was making an acquisition proposal with no historical sales data and little in the way of financial reports from Robin aside from her belief that the products had strong sales prospects.

In the end, Browne agreed to purchase the business by way of a royalty arrangement – Robin would get an initial $100,000 payment in exchange for the company's assets, with ongoing "earn-out payments." This was memorialized in an asset purchase agreement dated January 20, 2009. Pursuant to this agreement, Robin would sell all the assets of the Duncan businesses, including patents and trademarks for their

---

[3] There is conflicting evidence in the record on this point. At his deposition, Michael Browne professed very little knowledge of the deal; he had not even read the asset purchase agreement, even though his approval was required to go through with the acquisition. He did not think anyone at Browne other than Carter was involved. However, *Peter* Browne testified at his deposition that he had some initial involvement, though he did not perform any due diligence. And interestingly, his view at the time was that the Duncan business was not going to be viable without significant changes, though he did not specify what those changes might be. In any event, it appears reasonably clear from the record that Carter was the main player on Browne's end.

products, to an entity created by Browne for the purpose of acquiring the business.  This entity was appellant Duncan Kitchen Grips, Inc. (DKG).

In addition to the initial payment and earn-out payments (the intricate calculation of which we shall discuss in a moment), DKG had reporting and transparency obligations to Robin under the agreement.  It had to provide her with quarterly and annual reports on important financial data such as net sales and gross profit.  If Browne deemed it "reasonable," Robin could request and receive documentation backing up the annual numbers.  She could request an audit at her own expense of DKG's records relating to her earn-out payments.  She would be engaged as a paid consultant for DKG as requested between the closing of the agreement and December 31, 2019.  If Browne ever decided it wanted to stop operating the business or if net sales fell below $1 million, she had the right to repurchase it on agreed-upon terms.  Each year, she was entitled to a meeting with DKG representatives to review results from the previous year and plans for the future, (though her opinion on business strategy held no real weight).  And she got a discount on DKG products.

Presumably due to the murky nature of the business' finances, the asset purchase agreement included a labyrinthine procedure that would determine its final purchase price at a later date.  Prior to closing, Robin was to deliver to DKG an estimated balance sheet reflecting assets and liabilities.  At closing, she was to receive the initial $100,000.  Then, DKG had approximately three months to survey the company's actual assets and liabilities and provide a closing balance sheet to Robin.  If the post-closing survey revealed assets exceeding liabilities by more than $100,000, Robin would be paid the difference.  If liabilities exceeded assets, however, the difference would be deducted in equal amounts from Robin's future earn-out payments until DKG recouped the initial $100,000.

The earn-out payments were structured by period.  In the three months following closing, while DKG was doing its survey, Robin would be paid a uniform

4

$20,000 per month. These were called initial period earn-out payments. It is undisputed that DKG made these payments to Robin.

From May 2009 onward, however, her earn-out payments were to be based on yearly net sales. The payments were calculated as follows: Robin was to receive a graduated percentage of net sales as they reached certain threshold amounts – 5 percent of all net sales up to $1 million, 7.5 percent of all net sales from $1,000,001 to $1.5 million and so on. Then, a gross profit percentage amount would be either added to or deducted from her percentage of net sales. The gross profit percentage was an enumerated formula seemingly designed to adjust the earn-out payment so that it took cost of goods sold into account. If the gross profit percentage was below 45 percent for any given fiscal year, DKG could reduce Robin's earn-out payment, and if it was above 55 percent, DKG could increase her payment. The payments due from May 2009 onward were called advanced earn-out payments.

Ultimately, both the initial period earn-out payments and the advanced earn-out payments represented advances from DKG to Robin based on a projection of net sales for the year. The advances were then to be offset against the amounts owed once actual yearly sales figures were reported. The agreement itself set August 31, 2009 as the date the earn-out payments would be initially reconciled against the amounts actually earned. If for that time period, the actual amounts owed were more than the advances, Robin would be paid the difference by October 31, 2009. If the actual amounts owed were less than the advances, the overpayments would be deducted equally from earn-out payments to be made between October 2009 and December 2010. But moving forward, the reconciliations were to occur within 45 days of the close of the fiscal year. Any additional amounts owed to Robin would be paid within 50 days of the close of the fiscal year. And any overpayment would be deducted from future advanced earn-out payments beginning February 1 of the next fiscal year until fully recouped.

5

Once the deal closed, Carter had responsibility for DKG's day-to-day operations. He also oversaw earn-out payments to Robin under the asset purchase agreement.

Through September 2009, DKG's records showed that Robin was advanced far more than she was actually owed, and as a result, DKG stopped paying her earn-outs as of October 1, 2009. No gross profit percentage was ultimately added to or deducted from her earn-out payments because the percentage never fell out of the 45-55 percent range.

The cessation of her earn-out payments greatly impacted Robin's monthly cash flow. Around January 2010, she approached Browne about the problem. The parties agreed that she would get a $100,000 loan to help her with living expenses. However, the loan proceeds were not given to her in a lump sum; instead, they were advanced on a monthly basis between January 2010 and the end of June 2014. This ended up adding to her overall deficit vis-à-vis her earn-out payments. By July 2014, payments to Robin had once again stopped at Carter's direction.

To add to her frustrations, Robin claims there was little communication from DKG or Carter once the deal closed. She claims they rarely sent her quarterly or annual reports as required by the contract, and the sales reports she did get were usually only several lines on a sheet of paper with no explanation. She felt she was in the dark and was surprised when her earn-out payments ceased.[4]

*The Lawsuit*

About four months after her payments stopped, Robin filed suit against DKG and Browne, seeking accounting and alleging breach of contract-related claims, as

---

[4]     There is certainly evidence in the record to suggest that Browne and DKG, specifically Carter, did not take Robin very seriously. On May 7, 2013, she sent an email to Carter asking to get more information about less-than-stellar sales figures for DKG. Carter curtly responded that he had "provided all sales info required per the royalty agreement." The request merited more. After all, the asset purchase agreement gave Robin the right to make such requests for back-up documentation of the sales figures, so long as they were reasonable, and we can see nothing unreasonable about her request.

well as fraud and unjust enrichment. Rather than proceed with a jury trial, however, Robin agreed to forego her other claims in exchange for a complete accounting of the monies due to her under the asset purchase agreement. The parties agreed the accounting would be done by partners Ken Froese and Cyrus Khory of Froese Forensic Partners Ltd. (Froese), a boutique forensic accounting firm in Toronto.

Specifically, Froese and Khory were charged with "performing an audit to determine whether [DKG] accurately reported Net Sales to Robin Duncan for purposes of calculating her Earn-Out Payment as both of those terms are defined" in the asset purchase agreement. They were to audit "those books and records of DKG and any related Browne . . . entities necessary" for them to do this, and any disputes between the parties as to the scope of the audit would be resolved by the trial court should the parties be unable to do so themselves. The audit was to be conducted according to Generally Accepted Audit Standards (GAAS) and applicable professional standards. The partners would be jointly responsible for preparing an audit report to be submitted to the court.

Once the report was submitted, the parties would have an opportunity to file briefs addressing the consistency of the audit with GAAS and the other professional standards. The trial court would then hold a hearing on the issue, and if it found the audit was conducted in accordance with GAAS, judgment would be entered consistent with the report. However, if it was "not satisfied with the report," it could, "in its discretion, . . . issue any appropriate order on how the case should proceed that is otherwise consistent" with the parties' stipulation.

Froese got to work and conducted an audit of records from DKG, Browne, and its American subsidiary, Browne USA. On October 25, 2017, they issued a report containing several notable findings.

7

Perhaps Froese's most illuminating finding was that the Duncans' business was in the red when Robin sold it to Browne.[5] Given the disorganized nature of the Duncan business records, DKG had to cobble together its own valuation of assets versus liabilities, which showed the business was actually worth $-40,341.94 at the time of the acquisition. As a result, according to Froese, there was a "purchase price deficit" of approximately $140,342 (counting the initial $100,000 that Robin had received at closing). Because Robin had not challenged DKG's valuation within the timeframe provided in the agreement, it stood.

Because of initial period earn-out payments and advanced earn-out payments made between January and September 2009, by the time the parties entered into their loan agreement in January 2010, the deficit totaled $158,264. That is, in effect, how much Robin already owed Browne when it extended her the loan for her own personal cash flow.

Given the enormous deficit, Froese found DKG was entitled under the asset purchase agreement to stop advancing earn-out payments in order to pay down the deficit. It noted DKG had resumed payments to Robin by January 2017 when the deficit had been extinguished.

The second notable finding by Froese seems to have been a bit of a mixed bag for everyone. To Robin's surprise, Froese found DKG had included all sales in her earn-out payment calculations. But to DKG's surprise, Froese found it had used an inappropriate methodology called transfer pricing to value a certain portion of those sales. Transfer pricing, Froese said, is "[t]he price at which goods are bought and sold between wholly-owned entities (or divisions)." Transfer pricing can significantly impact

---

5    DKG told Froese that Robin had failed to provide an estimated closing balance sheet as required by the asset purchase agreement. Froese included this claim in its report. Robin, of course, disputed this, insisting she had provided a valuation of her company's assets to DKG.

a company's financials, because the company has much more latitude on where the price is set for "intercompany sales" as opposed to sales to external third-party customers.

After reviewing DKG's sales data, Froese found that it had included sales to external third-party customers, such as retailer chains, as well as sales to Browne subsidiaries which then sold the products to third party customers. As the years passed, the "intercompany sales," or sales to Browne's own subsidiaries, comprised a larger and larger percentage of DKG's annual total gross sales for purposes of Robin's earn-out calculations. At the same time, there was a corresponding decrease in third-party sales as these customers' sales were passed through Browne USA. When Froese replaced intercompany sales with third party sales in its calculations, total net sales increased 14 percent between 2009 and 2016 – which would clearly have translated into more earn-out potential for Robin.

There was one exception to this transfer pricing. In its sales reporting between 2012 and 2016, DKG had replaced all intercompany retail sales to Browne USA with third-party retail sales. It did not replace any other types of intercompany sales with third-party sales. Carter was able to provide an explanation for this peculiarity based on past Browne accounting practices[6], and Froese noted the asset purchase agreement itself was silent on whether it might permit transfer pricing. Froese left it to the court to determine the latter issue as a legal matter, but from an accounting perspective, it opined that earn-out payments should be based only on third-party sales. If the court were to adopt Froese's view on transfer pricing, the report said, Robin would be owed an additional $144,345.

---

[6] In 2012, Carter apparently instituted a change to the way DKG accounted for sales to third party customers. Browne had been a reseller of Duncan products prior to the acquisition. In order to keep the sales picture consistent with how it looked at the time of acquisition, Carter instructed the company controller, Laura Williams, to "minus out" sales to Browne and add in sales by Browne to the retailers. This change would tend to increase the net sales amount.

But this change was not uniform across all sales and was not in place for the duration of the term during which Robin was receiving earn-out payments.

Froese made a third interesting observation. In reviewing DKG's monthly sales between January 2009 and June 2017, it found that total reported net sales increased during the first three years of the period, but then steadily declined between 2012 and 2016. Toward the end of this period of time, Browne was undergoing some changes. In May 2015, husband-and-wife foreign investors by the name of Dennis Poon and Maggie Yau purchased a 60 percent stake in the Browne group of companies and the business expanded into Asia.

Not surprisingly, upon its issuance, the Froese report was met with skepticism on both sides. The parties swiftly filed briefs in order to lodge their objections to any finding in the report that did not comport with their position. More specifically, Robin contended that Froese had failed to thoroughly investigate her belief that DKG was funneling sales through numerous other Browne entities so as to keep them off DKG's books, especially since sales and marketing of the products had expanded into Asia. She also challenged Froese's methodology of sampling data rather than undertaking a complete forensic audit. And DKG was concerned about Froese's conclusions as to the use of third-party sales in calculating earn-outs.

Given that both sides objected to the audit report, the trial court decided to set the case for trial. DKG was skeptical of this – it wanted the court to excise the portion about owing Robin additional earn-out payments and adopt the remainder of the report. But the trial court observed that if DKG was, as Robin charged, "cooking the books," it could render the entire report doubtful in its accuracy. It denied DKG's motion to adopt the report and set the matter for trial.

*The Trial*

Testimony was taken over three days from four witnesses: Carter, Robin, Khory, and David Cohen, a sales manager for the Duncans who had stayed on to become general manager of operations with DKG until his departure in 2012. During Khory's testimony on the second day of trial, Robin's counsel revealed an interesting theory of

10

her case. Using DKG's year-end trial balance sheets for the period of 2009 to 2016, counsel had Khory confirm that debits for DKG's prepaid insurance had increased in 2012. When the deal had first gone through and for the two years following, prepaid insurance hovered around $3,000. In 2012, however, the debit for prepaid insurance shot up to over $14,000. It increased even further between 2013 and 2015, peaking at nearly $20,000. By mid-2016, it had decreased to around $5,000.

Robin's counsel asked Khory to opine as to whether the increase in prepaid insurance was a "red flag" to him. Khory, perhaps taken somewhat aback, stated he could not answer the question because the prepaid insurance was not an item that Froese looked at, and he also felt he needed more than just the trial balance sheets to form an opinion on that issue.

Robin testified that when she ran the business and procured the insurance, the product liability insurance premiums were the only insurance premiums she prepaid at the beginning of the year because they were based on the previous year's gross sales. At year's end, the insurance company would audit their sales and adjust the premium. She claimed product liability insurance usually cost around $3,000 per year, and when she owned the business, gross sales topped out at $2 million in one year. The premium was thus based on a ratio - $1 of premium would equate to a certain amount in sales – "for instance," she said, "a dollar would cover $400 in sales."

Upon inspection, none of DKG's year-end trial balance sheets showed an expense account for product liability insurance, although they contained accounts for other types of insurance such as workers' compensation, health insurance, and general and business insurance. Khory confirmed that none of the values in those other insurance accounts increased to the extent shown in the prepaid insurance account. He was asked to assume that the prepaid insurance entries in the trial balance sheets represented product liability insurance premiums and that the premiums were based on gross sales. Dividing the 2010 gross sales figure of $1,799,820 by the prepaid premium of $3,023.80 showed a

11

ratio of $1 dollar in premium to approximately $595 in gross sales. Counsel had Khory apply that baseline $1-to-$595 ratio to the prepaid insurance premiums listed on subsequent year-end trial balance sheets in order to calculate the gross sales for each year. They ended up showing significantly higher amounts of gross sales than what was reported on DKG's books. When asked to run the earn-out calculations to see how these numbers would impact the amounts owed to Robin, Khory testified that royalties would be far higher than the amounts for which DKG had been crediting her.

Since Robin's counsel had already run the earn-out calculations using a different ratio ($1-to-$433), the parties stipulated that, if that ratio was applied to the premiums to calculate actual gross sales, the total amount of earn-out payments due Robin under the asset purchase agreement would have been $3,099,357. Of course, DKG vehemently disagreed with all of the assumptions necessary to support this theory. Nevertheless, it was willing to stipulate – as one must – that math is math.

Khory reiterated that his calculations were based on the assumption that the prepaid insurance entries referred only to yearly products liability insurance premiums. Froese did not analyze insurance at all, so he was unable to say for sure what those entries were about. Khory also admitted that he had not analyzed the books and records of any other Browne entities besides DKG, Browne USA, Browne and a small French subsidiary called Berard, although there were numerous other entities in existence.

DKG claims it was not aware of Robin's insurance-related theory of underreported sales until Khory's questioning. But it did not seek a continuance in order to marshall any documents needed to test the theory.[7] On redirect, its counsel explored other possible bases for the prepaid premium increase, noting workers' compensation insurance expenses had started rising significantly in 2012. When prompted with this

_____

[7]     After hearing the Khory testimony on direct, DKG's counsel and Carter determined they could not obtain copies of the insurance policies from DKG's broker in time to present them at trial, so they decided Carter could testify instead. They apparently did not discuss whether they ought to seek a continuance to get the policies.

new piece of information, Khory concluded the prepaid insurance premiums likely increased due to increased expenditures on workers' compensation insurance.

DKG then put Carter back on the stand to explain the workers' compensation insurance increase. He claimed DKG's workers' compensation premiums had gone up by a factor of four or five in the 2011-2012 timeframe. In the beginning, DKG's insurance broker had mis-rated employees in the Tustin manufacturing plant as office workers rather than factory workers (who would be subject to higher workplace injury risk). In 2011 or 2012, the broker realized that the rating was incorrect and recategorized them, resulting in substantially higher premiums. On cross-examination, Carter conceded that product liability insurance was usually paid in advance and the premiums for it were based on gross sales.

The trial court issued a tentative statement of decision on May 9, 2019. It accepted Robin's insurance-related theory in large part because DKG had failed to offer any business records to refute the theory and also because DKG's conduct in discovery suggested that it had been either hiding documents or manipulating figures.[8] However, the trial court found Carter's workers' compensation explanation for the increase in prepaid premiums "plausible" and was not persuaded Robin had proven 100 percent of the increase in prepaid premiums was due to increased sales. It concluded only 25 percent of the increase could be attributed to products liability insurance and consequently, DKG had underreported sales by 25 percent. It also concluded DKG owed the $144,345 in additional royalties calculated by Froese based on the allegedly improper use of transfer pricing.

Upon receiving the tentative decision, DKG moved to reopen in order to introduce previously unseen evidence that there was no increase in product liability

---

[8] Two facts weighing heavily in the trial court's mind were (1) not a single current DKG or Browne employee came to testify at trial, and (2) Carter and Williams, who had since left DKG's employ, had been given access to company books and records the night before they were to testify as persons most knowledgeable for DKG in order to produce records for the depositions. These records had not previously been produced to Robin's counsel.

13

insurance premiums. The motion was denied essentially on a too-little-too-late basis. Because DKG had failed to produce the documents during discovery and before the close of evidence at trial, and because of the eleventh-hour nature of the production it *did* make, its credibility had been tarnished in the court's eyes.[9]

The court entered its statement of decision on September 3, 2019, which provided for a total award to Robin of $1,399,351.97 including prejudgment interest. Judgment was entered that same day for that sum plus postjudgment interest.

## DISCUSSION

DKG finds three aspects of the judgment erroneous: (1) the trial court's conclusion that sales were underreported by 25 percent based on increases to prepaid insurance and its calculations of additional royalties due based on that conclusion, (2) the award of $144,345 based on transfer pricing, and (3) what it believes to be the trial court's refusal to adopt the Froese audit report wholesale. With one small exception, we reject these arguments.

## I.        Standard of Review

DKG's first two arguments are subject to a substantial evidence standard of review. "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. If such substantial evidence

---

[9]        The insurance documents DKG submitted with its motion seem to raise more questions than they answer. DKG submitted a declaration from its insurance broker, Kevin Loftus, who explained that DKG's product liability insurance was subsumed under the "Products and Completed Operations" coverage in its comprehensive general liability insurance. The premium for this coverage was determined by sales. According to the documents Loftus provided, the premiums for this coverage did not stray too far from the $11,000-12,000 range until the premiums increased slightly in the 2013-2014 policy period and then shot up in the 2014-2015 policy period. To further muddy the waters, DKG did not have its own policy. Instead, it was an additional insured on another Browne entity policy.

14

be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874 (italics omitted).)

We review DKG's third argument under an abuse of discretion standard. The weight to be given the audit report was a matter left to the trial court's discretion in the stipulated order entered pretrial. Thus, we will not disturb the trial court's decision unless it went outside the bounds of reason or resulted in a miscarriage of justice. (See *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393-394.)

**II.        The 25 Percent Underreporting Conclusion**

The trial court decided to award Robin $822,053.30 in additional royalties based on underreporting of sales as determined through her insurance premium theory. DKG finds fault with this for three reasons. First, it contends the 25 percent calculation represents an impermissible compromise. Second, it claims the calculation finds no support in the evidence. And third, it argues the finding conflicts with the trial court's glowingly positive assessment of Khory's credibility as an expert witness and its conclusion that the Froese report complied with GAAS.

The first two arguments are somewhat related. A compromise verdict usually occurs in jury trials when some jurors do not believe the plaintiff has established liability, but the panel compromises and awards a small recovery nonetheless. (See *Lauren H. v. Kannappan* (2002) 96 Cal.App.4th 834, 840.) When such a verdict has occurred, a new trial is required. (*Ibid*.) Here, DKG argues the trial court's award of 25 percent rather than 100 percent of the purported increase in sales was a compromise to plaintiff because there was actually very little in the way of hard evidence to support the insurance theory.

We do not think the trial court compromised the liability issue. It found DKG liable for underreported sales. In its view, the dramatic rise in prepaid insurance

15

between 2012 and 2015 was a relevant trend line which had not been adequately explained by DKG. While it agreed the larger portion of the increase was plausibly explained by the rise in DKG's workers' compensation premiums, it did not believe this was the only cause of the increase. It found at least some of the increase was attributable to product liability insurance.

To compound DKG's problem, the trial court did not find its business records thoroughly credible given the last-minute production of many of them and the lack of testimony from any current employee. The court was entitled to resolve any doubts or ambiguities concerning the records against DKG. (See *Bove v. Beckman* (1965) 236 Cal.App.2d 555, 564 ["'[t]he acceptance or refusal to accept an inference reasonably deducible from the evidence, or the acceptance of one of several conflicting inferences reasonably deducible therefrom, is a function committed to the discretion of the trier of fact and may not be determined as a matter of law.' [Citation.]"]; see also *W.S. v. S.T.* (2018) 20 Cal.App.5th 132, 154 ["As the trier of fact, the trial court must evaluate the credibility of witnesses and make determinations when conflicting evidence is presented."].)

There was sufficient evidence to support the trial court's conclusion about insurance. There was no information in the trial balance sheets explaining how product liability insurance was expensed – indeed, DKG itself did not seem to know. It put Carter on the stand a second time to explain the workers' compensation premium increase, but he did not explain the expensing of *product liability* insurance on the balance sheet. Meanwhile, Robin testified that when she ran the company, such insurance was always prepaid. Everyone agreed product liability insurance premiums were tied to sales. The Froese audit had not analyzed the finances of *all* Browne-related entities to determine if some Duncan product manufacturing and sales may have been moved off the books of the entities it did audit. The trial court appeared to find Carter a less-than-authoritative witness on these matters due to his role in the deal and because of

16

the last-minute production of records. Based on the aforesaid evidence, the trial court inferred the existence of additional sales which had been hidden from Robin. Right or wrong, this was reasonable; and even if we may have drawn different conclusions, we may not substitute our judgment for that of the trial court.

DKG cannot be faulted for wondering at the basis for the trial court's apportionment of 25 percent of the prepaid premium increase to product liability insurance. The statement of decision gives no explanation for it. But since the trial court had already determined that the prepaid premium increases at least partially reflected an increase in sales, it had to come up with a mathematical way to account for them. It did not believe DKG had provided it with all information necessary to do that, so it decided to use the information it did have.[10]

DKG believes Robin unfairly ambushed it with her insurance theory of underreported sales on the second day of trial, leaving it no time within which to obtain necessary documents to mount a defense. While she generally requested insurance-related documents in discovery, DKG argues, she never sought to meet and confer or compel responses after DKG lodged objections to those requests. Thus, DKG had no reason to expect that insurance was important to her.

We are skeptical. First, this was an argument DKG could and should have raised with the trial court *before* the close of evidence. If indeed DKG had been

---

[10]     To the trial court's credit, it made efforts to elicit the information it sought. After the attorneys had completed their examination of Carter, the trial court questioned him a bit on this topic:

"THE COURT: But do you have any records that show what percentage of an increase was due to workers' comp as opposed to product liability?

THE WITNESS: "I don't have them on me today, but they all exist, yes.

THE COURT: But can you say today what percentage of the increase was due to which coverage?

THE WITNESS: I think the best thing would be to…actually look at the financial statements and look at what was expected…you could then take the expense in the financial statements, tie it back to payroll dollars, and then you'd be able to do some calculation. So if you'd like, I could sit down and do all that for you.

THE COURT: We had that accountant in here, our forensic accountant doing that.

THE WITNESS: Okay."

There was no objection or request from DKG's counsel for any clarification of this exchange, and counsel never sought a continuance to obtain and produce the documents to which Carter was referring. Nevertheless, it seems to us Carter was suggesting the financial statements would have been his starting point in making the necessary calculations. And the trial court seems to have followed this suggestion.

17

legitimately unable to mount a defense to this theory earlier, it could have sought a continuance in order to obtain the documents necessary to do so before the matter was submitted to the trier of fact for decision. [11] In any event, Robin's request for insurance documents in discovery was a clue that she at least found the issue nominally relevant. One cannot claim ambush if the "attacker" has been this visible.

As Robin points out in her respondent's brief, she had been paying about $3,000 per year for product liability insurance prior to the acquisition. In 2009, DKG spent about $8,438 on workers' compensation insurance, according to its balance sheet. As between those two types of insurance, the trial court could thus have reasonably surmised product liability insurance constituted around 36 percent of the expenditures in a normal year. It recognized that mis-rating employees for workers compensation insurance would likely result in a larger increase in premiums than an increase in sales. It therefore settled on 25 percent as the proper approximation of the increase in prepaid premiums attributable to product liability insurance. We find nothing unreasonable about this deduction, and it does not suggest compromise to us.

DKG also argues the $1-to-$433 premium dollars-to-sales dollars ratio is flawed. The $433 multiplier came about by dividing the gross sales from 2009 ($1,415,637) by the prepaid insurance for 2010 ($3,264.07). Since there would have been no gross sales figures for 2010 at the time the premiums were prepaid at the end of 2009, this was a reasonable ratio to apply if one assumes the entire prepaid insurance amount at that point was attributable to product liability insurance.[12]

---

[11] DKG did move to reopen the record *after* the close of evidence to submit documents and declarations to counter the new theory. But by this time, the trial court had issued its tentative decision. In his declaration supporting the motion to reopen, DKG's counsel seemed to concede that he did not act earlier because he "did not believe that there was any likelihood that the Court would endorse Plaintiff's new theory of recovery since the only evidence she had to support the theory was an increase in prepaid insurance that simply did not tie to any insurance expense, other than workers' compensation." We cannot save a litigant from the consequences of its own faulty predictions.

[12] This was a reasonable assumption given that Robin says the only insurance she ever prepaid was product liability insurance and 2009 was something of a transition year between her and Browne.

18

DKG argues the lack of a product liability expense account on its trial balance sheet proves the increase was wholly attributable to workers' compensation insurance. Pursuant to basic accounting principles, it argues, the prepaid insurance was an asset that could only be offset by an expense elsewhere in the balance sheet. The only insurance expense account to increase was the workers' compensation account. Thus, the increase must be attributed to workers' compensation and the lack of an expense account for product liability insurance merely shows that product liability insurance was subsumed within another insurance expense account.

To be sure, this is a plausible explanation.

But there were other inferences equally plausible. One is that product liability insurance simply was not captured on the balance sheet. Indeed, despite going over insurance entries on the 2015 trial balance sheet at some length at trial, Carter was never able to identify a precise account dealing with product liability insurance, even though he was the person responsible for creating the document and maintaining its accuracy.[13] He could only say that the prepaid insurance related to "all insurance," which is hardly precise. Moreover, the trial court clearly suspected Carter of having an incentive to manipulate figures or hide information. It did not trust the completeness of the records he had prepared. We cannot disturb this credibility determination from our distance.

Another question DKG raises is this: if there were unreported sales, why didn't Froese find any corresponding raw materials purchases and manufacturing costs necessary to support such sales? A valid point. But here we must remind ourselves that Froese did not analyze the books and records of any of the Browne subsidiaries located in Asia where it was manufacturing and selling products. The court may have suspected that such costs were accounted for in these unaudited records.

---

[13] He was also the one responsible for purchasing insurance for DKG.

19

This brings us to DKG's third argument. The trial court's overwhelmingly positive estimation of Khory as a witness in no way required it to accept each and every one of his opinions. It was free to accept some of his testimony and findings and disregard others so long as there was a rational basis for doing so. (See *Morrison v. Housing Authority of the City of Los Angeles Bd. of Comrs.* (2003) 107 Cal.App.4th 860, 868.) Here, the trial court adopted the Froese report insofar as the auditor had conducted the necessary investigations. Khory admitted that he had not even thought to analyze the reasons behind the increase in prepaid insurance premiums nor the potential correlation between those increases and product sales. The trial court was thus entitled to find that his opinion on the reasons for the increase in the premiums lacked a valid basis. (See Evid. Code, § 801, subd. (b).) Again, we see nothing here to undermine confidence in the judgment.

The problem we must raise with the judgment comes in its calculation of damages due under Robin's insurance theory. The judgment provides a table listing each year's purportedly underreported sales and then earn-out payments and prejudgment interest that would flow from those. We find the information in this table difficult to square with the evidence.

First, the table begins with the year 2010. This does not comport with the evidence presented about insurance. Prepaid premiums skyrocketed beginning with the 2012 year-end balance sheet, not the 2010 or 2011 balance sheet. The prepaid insurance category increased from $3,211.32 at the end of 2011 to $14,650.66 at the end of 2012. Prior to 2012, the prepaid premium category held fairly steady around $3,000. Indeed, the prepaid insurance number decreased from 2010 to 2011. So under the insurance theory, sales began to go underreported in 2011 at the earliest.[14] This is corroborated by

---

[14] Khory testified that premium increases would reflect a previous year's sales, so we assume 2011 would be the appropriate starting point for the underreporting of sales. But the trial court must make the ultimate determination on remand.

20

the Froese report, which showed DKG's sales beginning to decline in 2012. One might reasonably suspect DKG of fudging numbers if it was reporting declining sales, and not so much if sales were reportedly increasing.

Additionally, the trial court had determined product liability insurance was responsible for 25 percent of the prepaid premium *increase*. But its calculations appear to have applied the 25 percent apportionment to the *total amount of prepaid insurance* for each year from 2010 through 2016. We cannot agree with this calculation. For instance, assuming product liability insurance was responsible for 25 percent of the increase in premiums each year, in 2012, product liability insurance would have been responsible for $2,859.84 of the $11,439.34 increase that year. Multiplying $2,859.84 by $433 results in gross sales of $1,238,308.56 for 2011, which is less than the amounts given in the trial court's calculations. In fact, the trial court's calculations start to balloon for 2012 onward, reaching their peak at $8,670,144.41 in underreported sales for 2014. These numbers seem to us highly inflated given that prepaid insurance only modestly increased year-over-year after the initial spike in 2012.[15]

Additionally, it is unclear whether the underreported sales listed in the table represent gross or net sales. This is an important distinction. Even though the product liability premiums were calculated based on gross sales, Robin's earn-out payments, pursuant to the parties' agreement, were to be calculated using *net* sales. The trial court's table has columns for "royalties due" but it is not clear to us whether these figures were calculated using gross or net sales.

Because the trial court's calculation of underreported sales seems out of alignment with its findings regarding increases in prepaid insurance, we reverse that part

---

[15]     Indeed, prepaid insurance *decreased* in the 2015 year-end trial balance sheet, so presumably, under her own theory, Robin would not be owed any earn-out payments for underreported sales in 2014. Again, however, this issue must ultimately be resolved by the trial court.

21

of the judgment and remand it to the trial court for further proceedings in order to clarify or arrive at an accurate figure based on the evidence in the trial record.

**III.      The Transfer Pricing Issue**

As already discussed, the transfer pricing issue was one originally raised not by a party but by Froese in the audit report. Froese was not inclined to make a legal determination as to the meaning of the word "Net Sales" in the party's contract, but it could opine from an auditing perspective that transfer pricing is an imperfect and inappropriate practice given its unique susceptibility to manipulation. After the close of evidence, both sides submitted briefs on the issue of whether the contract permitted transfer pricing. DKG argues that the trial court failed to make a finding on this point, thus rendering its $144,345 award on this issue wanting. Again, we must disagree.

The trial court *did* make a finding on this point. It awarded Robin the additional royalties recommended by Froese stemming from the use of transfer pricing. It may not have provided discussion on that point, but "a trial court rendering a statement of decision under Code of Civil Procedure section 632 is required to state only ultimate rather than evidentiary facts because findings of ultimate facts necessarily include findings on all intermediate evidentiary facts necessary to sustain them." (*In re Cheryl E.* (1984) 161 Cal.App.3d 587, 599.) In order to award Robin that sum, the trial court necessarily must have first determined that the parties' contract did not permit transfer pricing. And such an interpretation is reasonable. The asset purchase agreement's definition of the term "Net Sales" is fairly expansive. It includes "all gross invoiced sales of any products that are based upon or derivative of" the Duncans' patents or products that they "designed, manufactured or sold . . . prior to the Closing Date during the applicable Fiscal Year" less billbacks. The definition does not restrict net sales to those made by DKG.

Moreover, neither side put forth evidence at trial regarding their respective understandings of transfer pricing, or whether their contract permitted it. In light of

22

Khory's expert opinion that such pricing was improper from an accounting perspective, the trial court was free to adopt that opinion in the absence of any specific contrary language in the asset purchase agreement. We find the trial court did not err in awarding damages for DKG's use of transfer pricing based on the Froese report.

**IV.      The Audit Report**

Finally, DKG argues the trial court abused its discretion in failing to adopt the Froese report. It is unclear to us as to whether DKG challenges the trial court's denial of its pretrial motion to adopt the Froese report or whether it challenges the trial court's adoption of parts of the report in the ultimate judgment. DKG did not argue in its brief that the pretrial ruling was directly appealable, and even if it were, the appeal from that ruling would be untimely. (See Cal. Rules of Court, rule 8.104, subd. (a)(1).) In any event, the trial court was within its discretion to adopt the course that it did.

The parties' stipulation provided that if the trial court found the Froese report was consistent with GAAS and other professional standards, judgment "consistent with the findings of the report" was to be entered. But if the trial court was "not satisfied with the report," it had the discretion to "issue *any* appropriate order on how the case should proceed that is otherwise consistent with" the stipulation. (Italics added.) The trial court was not satisfied with the report when it made its ruling on the pretrial motion, and it decided to take testimony to help it resolve the parties' objections before deciding how to view the report. There is nothing in the stipulated order prohibiting the trial court from doing so.

Further, we cannot help noting the trial court's ultimate assessment: Khory was a highly credible witness and the report he prepared complied with GAAS. His finding on transfer pricing required additional royalties to be paid to Robin. Clearly, these conclusions indicate that the trial court carefully considered the report's findings and adopted them where appropriate.

23

## DISPOSITION

The judgment is affirmed in all respects except as to the calculation of damages, which is remanded to the trial court for further proceedings consistent with this opinion. Costs on appeal shall be split equally between appellant and respondent.

                                             BEDSWORTH, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.