Filed 3/18/24  Maldonado v. County of Riverside CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JOEY MALDONADO,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>COUNTY OF RIVERSIDE,<br><br>    Defendant and Respondent. | D082761<br><br><br><br>(Super. Ct. No. CVRI2104513) |


APPEAL from a judgment of the Superior Court of Riverside, Eric A. Keen, Judge.  Affirmed.

Stone Busailah, Michael P. Stone, Muna Busailah, and Robert Rabe for Plaintiff and Appellant.

Liberty Cassidy Whitmore, Jennifer M. Rosner, and Brian R. Dierzé for Defendant and Respondent.


Joey Maldonado, a correctional officer employed by the Riverside County Sheriff's Department (Department), appeals the trial court's denial of his petition for a writ of mandate challenging his 317-day suspension without pay.  Maldonado contends the court erred both procedurally and

substantively by: (1) finding there was sufficient evidence that he violated Department policy; (2) relying on evidence of misconduct that was not specifically alleged in the Department's Letter of Intent (see Gov. Code, § 3304, subd. (d)(1)[1]); and (3) finding that his suspension was not an abuse of discretion. We conclude the trial court did not err and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*A. The Cell Search*

On June 22, 2019, Maldonado was working for the Department as a senior correctional deputy at Smith Correctional Facility. Around 8:30 p.m., Deputy Nigel Hinson and Maldonado searched a cell occupied by inmates Rickey McDonald and Ronald Coleman on a second-floor top tier above a communal dayroom below. In the hours leading up to the search, McDonald and Hinson exchanged words on more than one occasion, and McDonald thought Hinson was antagonizing him. An officer escorted McDonald and Coleman out of the cell while it was being searched.

Choppy video footage of the dayroom area shows that Hinson and Maldonado searched the cell for several minutes. The dayroom floor was empty before the search started, but at some point during the search, items appeared on the floor underneath McDonald's cell. Maldonado put some items from McDonald's cell into a trash bag. After the search, Hinson walked to a bottom tier cell occupied by James Goodwin, an inmate "rep" who helped keep order among inmates, and spoke with him for a moment before exiting the dayroom.

---

[1] Undesignated statutory references are to the Government Code. Section 3304, subdivision (d)(1), provides in relevant part that when a public agency determines that discipline may be taken against a public safety officer, "it shall complete its investigation and notify the public safety officer of its proposed discipline by a Letter of Intent or Notice of Adverse Action articulating the discipline . . . ."

2

According to McDonald, his cell was left in disarray and some of his food items were opened, but his cellmate's belongings were untouched. During the search, McDonald saw the deputies throwing things over the top tier railing onto the floor of the dayroom. Goodwin also saw items falling from the top tier during the search. Around 8:43 p.m., video footage shows Coleman retrieving items from the dayroom floor. Hinson and Maldonado did not document the items removed during the search or complete a cell search log.

*B. The Fight*

After the search, Hinson made an announcement on the public address system that dayroom time was suspended "thanks to McDonald." Dayroom time allows inmates to watch television, take a shower, use telephones, and take advantage of other benefits. According to Deputy Oliver Cepeida, a new officer on duty at the time, Hinson also spoke to some inmates over cell intercoms and told them McDonald was responsible for the suspension.

Shortly thereafter, Hinson or Maldonado opened only the bottom tier cells, which was unusual because typically both the top and bottom tiers are opened at the same time. Video footage shows Goodwin walking over to the intercom connecting the dayroom with the "pod office" where Hinson and Maldonado were working. Goodwin told a Department investigator that Hinson informed him they were going to lock down the bottom tier again and suspend dayroom because of McDonald's misconduct. Around this time, Cepeida believed he heard Hinson say "take care of it" or something along those lines. Cepeida left the pod office to go to the restroom, in part because he felt "uneasy" and "uncomfortable."

Goodwin then walked to McDonald's cell to speak to him. The deputies would have been able to hear the conversation between Goodwin and

3

McDonald from inside the pod office, as well as incoming inmate calls through the intercom. Goodwin told McDonald he would face "discipline," and then Goodwin went to talk to another inmate, Davion Owens. Goodwin told an investigator that after he returned to his cell for lock down, Hinson used the intercom system to tell him to "take care of" disciplining McDonald "now."

Soon afterwards the deputies opened both tiers—to the surprise of some inmates given the announced dayroom suspension—and Goodwin emerged from his cell without a shirt on because he planned to fight McDonald to discipline him. At first, Goodwin went upstairs to McDonald's cell and told him to come down to the bottom tier for discipline. When McDonald refused to come down, Goodwin, his cellmate David Moore, and Owens walked up the stairs to McDonald's cell and began punching McDonald. About one minute later, the deputies told the inmates to lock down and Goodwin, Moore, and Owens returned to their cells. Hinson did not instruct the inmates to stop fighting or lock down until after the fight was already over. None of the officers on duty left the pod office to get PepperBalls or spray, ordered the inmates to stand down, or attempted to break up the fight, despite being trained to do so in those situations.

After McDonald walked down to the dayroom floor to seek medical attention, two deputies handcuffed him, and Maldonado and Hinson went to Goodwin's cell. Goodwin, Moore, and Owens were led to holding cells without being handcuffed. According to deputies' testimony, leaving suspects unhandcuffed is inconsistent with what deputies are trained to do in those circumstances. And although deputies are supposed to advise suspects of their *Miranda*[2] rights and interview them, the inmate suspects said that was

---

[2]    See *Miranda v. Arizona* (1966) 384 U.S. 436.

not done here, and they were returned to their cells about 20 minutes later. Goodwin told a Department investigator that while Hinson was escorting him to a holding cell, Hinson commended or thanked him.

Immediately after the fight, McDonald spent two days in the facility's intake area before being transferred to another facility. He also was not interviewed or *Mirandized*. Hinson radioed dispatch afterwards and indicated he would not be writing a report about the incident, and that a report should not be tracked in internal systems. Goodwin received no discipline in connection with the fight.

### C. The Investigation

McDonald filed a grievance a week later, and the Department initiated an investigation. The Department's investigators reviewed logs, video footage, audio recordings, and other documentation, and also interviewed deputies and inmates. The lead investigator said that the facility's video system only records when the camera detects motion and "maybe a couple of frames a second[,]" which made the footage "not very smooth . . . ."

The audio recordings collected by Department investigators included an outgoing phone call Goodwin made to his girlfriend the morning after the incident. In the call, Goodwin said that deputies told him to take care of the discipline "now" instead of later. Goodwin also said that afterwards, Hinson told him "good looking," which he interpreted to mean that Hinson condoned what happened.

### D. Disciplinary Action

Chief Edward Delgado, a correctional officer with 21 years of experience, reviewed the investigation results and supporting documentation. Based on his review, Delgado concluded that Hinson and Maldonado performed the search of McDonald's cell in an unprofessional manner as

5

retaliation for McDonald's disrespectful behavior. Delgado found it significant that the deputies did not touch Coleman's belongings during the search, but "ruin[ed]" McDonald's property. According to Delgado, there was only "one way" for McDonald's belongings to end up on the floor of the dayroom, which was for the items to be "pushed off into the tier outside of the cell door[.]" Delgado first said he saw the deputies "kick the stuff over the top tier onto the ground into the dayroom." He later said that while the video does not show the deputies kicking the items, it was "obvious that based on their movements" and objects "falling and on the ground on the floor of the dayroom" that the "only way they got there was" by the deputies kicking them. Citing his "training and experience at every level[,]" Delgado believed the search was a "fuck-you cell search" which was "a catalyst" for the fight that followed.

Delgado also credited witnesses' statements that Hinson made a loudspeaker announcement identifying McDonald as the reason for the dayroom suspension, and that Hinson later communicated to Goodwin via intercom that Goodwin should take care of disciplining McDonald "now." When Delgado saw from video footage that the deputies only opened the bottom tier at first, he said "it was very obvious what was going on" because the tier remained open just long enough for Goodwin to go upstairs and talk to McDonald, confer with Owens, and then return to his cell. As for what happened after the fight, Delgado observed that in this particular dayroom—which housed repeat offenders with a higher "propensity for violence"—it was unusual that McDonald was handcuffed, but not the suspected aggressors. Delgado also found it unusual that the deputies took no statements, did not *Mirandize* the suspects, and did little to document the incident.

6

Delgado concluded that for a senior deputy with 12 years of experience with the Department, Maldonado displayed incompetence by failing to complete a cell search log as required and destroying McDonald's property during the search. Delgado noted that Maldonado could have suspended dayroom time for McDonald alone instead of for everyone in the unit, or he could have given McDonald a disciplinary marker for being disrespectful, which was "very, very common." Delgado also concluded Maldonado was negligent when he failed to intervene in Hinson's retaliatory actions and then failed to report what happened.

On June 30, 2020, Delgado sent Letters of Intent to Hinson and Maldonado pursuant to *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, a case addressing due process considerations in the context of civil service employee dismissals. The letter to Maldonado informed him that Delgado had made a preliminary determination that Maldonado's employment should be terminated because he violated the Memorandum of Understanding (MOU) between the Riverside Sheriff's Association and County of Riverside due to "a. Incompetence [¶] c. Inefficiency or negligence in performances of duties. [¶] f. Willful violation of an employee regulation . . . . [¶] m. Conduct either during or outside of duty hours which adversely affects the employee's job performance or operation of the department in which they are employed."

The letter further specified that the proposed discipline was based on violations of the Department's General Orders under sections 105.09 and 203.07, which require Maldonado to properly execute "all assigned duties" and "report violations of any laws, policies, procedures, rules or regulations of the Department when committed by another member to a supervisor as soon as possible." Under the heading of "Facts In Support of Proposed Discipline," the letter stated that in connection with the cell search and McDonald's

7

assault, Maldonado either "failed to recognize, condoned and was complicit to" Hinson's actions, or he "lacked the leadership and fortitude necessary to correct and report" Hinson's misconduct, which "caused injury to McDonald and exposed the Department" to civil liability. The letter noted that Maldonado had been suspended on a prior occasion for 160 hours in 2017, which other documentation showed was for hitting and kicking a female deputy while he was intoxicated.

After an August 2020 pre-disciplinary meeting in which Hinson and Maldonado were both represented by counsel and each had the opportunity to make statements, Delgado sent a final notice of termination to both deputies.

*E. Arbitration*

Maldonado and Hinson appealed their terminations and entered arbitration pursuant to the MOU. During the arbitration proceeding, Goodwin recanted some of his prior statements to the Department investigator and testified that he had lied about Hinson asking him to discipline McDonald "now," about hearing a loudspeaker announcement identifying McDonald, and about Hinson commending him for the fight. Goodwin said he fabricated those parts of his interview because he was "angry." When asked about the call recording in which he told the previous version of events to his girlfriend, Goodwin testified that he only said those things so she would not "get mad" at him for "get[ting] in trouble."

Nonetheless, Goodwin testified that he knew McDonald was the reason for the dayroom suspension, and that he used the intercom system to call the pod office and tell Hinson that he would "deal with" McDonald later. When the bottom tier opened, he used that opportunity to confront McDonald instead of waiting until the next day. He only heard a loudspeaker announcement instructing him to "lock it down" and return to his cell after

8

the fight already ended.  He also testified that he was not *Mirandized* or interviewed after the incident.

Maldonado testified that he would never allow or condone an inmate imposing discipline on another inmate.  While he was uncertain about why he searched McDonald's cell that night, he said that none of McDonald's property was destroyed in the process, and that not all searches are entered into the cell search log.  Maldonado did not recall Hinson identifying McDonald as the reason for the dayroom suspension, telling Goodwin to discipline McDonald, or thanking Goodwin afterwards.  He also did not recall why the tiers were opened separately after dayroom time was suspended.  Maldonado acknowledged that assault suspects are typically handcuffed, but he made a "judgment call" not to handcuff the suspects after the fight.  He noted that an activity log from the date of the incident did not reflect that a cell search occurred, even though it should have, and that he did not create a report for the incident.  Maldonado said "we might have made some mistakes as far as paperwork and . . . entries on the log, but nothing intentionally[.]"

Hinson testified that he did not tell Goodwin to discipline McDonald, did not single McDonald out in any announcement or communication, and did not thank Goodwin for assaulting McDonald.  He also did not recall why only the bottom tier was opened initially.  Hinson confirmed that by the time he "called it out" on his radio, the fight was over.  He acknowledged that he was assigned to write the incident report, but said he forgot to do so and mistakenly conveyed to dispatch that there was no need to track the report.  Hinson said he *Mirandized* Owens and Moore and interviewed McDonald, Owens, and Moore, but he had no notes from any interviews.

Several deputies testified as character witnesses in support of Maldonado and Hinson.

9

*F. Arbitrator's Decision*

The arbitrator issued a written decision, finding first that although Maldonado's[3] Letter of Intent cited the Penal Code, California Title 15, and Corrections Division Policy, "no corresponding factual basis" supported alleged violations of those particular rules. The arbitrator therefore "confine[d] his decision . . . to the provisions of the MOU, General Orders and policies specifically noticed and analyzed in the disciplinary notices."

Applying a preponderance of the evidence standard, the arbitrator concluded that the search of McDonald's cell was not properly or professionally done and was prompted by McDonald's disrespectful behavior. He credited McDonald's testimony that only his belongings were targeted by the search, and that some of his items were destroyed or thrown from the top tier. The arbitrator noted that the deputies could have used other ways of responding to McDonald's disrespectful behavior, such as by issuing a disciplinary marker. The arbitrator also determined that while cell search logs and activity reports are not always prepared, Hinson or Maldonado should have ensured they were done in this instance.

The arbitrator further found that Maldonado was negligent in failing to handcuff the assault suspects considering evidence that doing so was the preferred practice. The arbitrator concluded that both the cell search and the failure to handcuff violated the MOU's provisions related to "incompetence, inefficiency/negligence and conduct unbecoming an officer[,]" as well as General Order section 105.09 relating to "Proper Execution of Duties."

The arbitrator found there was insufficient evidence, however, that Hinson orchestrated the attack on McDonald, given Goodwin's testimony

---

3 Although both Maldonado and Hinson appealed their terminations initially, the arbitrator's decision only addresses Maldonado's appeal.

10

recanting his prior statements. The arbitrator determined that the assault was caused by Goodwin deducing that McDonald was the reason for the dayroom suspension, and by McDonald's disrespectful attitude towards Goodwin. The arbitrator believed Maldonado did not intentionally destroy McDonald's property, and he credited Maldonado's testimony that mistakes were made during the incident. Accordingly, the arbitrator found that Maldonado did not condone, and was not complicit in, any orchestrated attack on McDonald. He did find though that Maldonado was "negligent in failing to recognize that Inmate Goodwin was not locking-down, and was proceeding up the stairs to confront Inmate McDonald." He further observed that it was "obvious that [Maldonado] should have addressed Goodwin's actions and/or recognized that an assault could occur."

The arbitrator ultimately decided that Maldonado should be reinstated because termination was excessive given the circumstances, but that the period between his last date of employment and reinstatement should still constitute a suspension.

*G. Writ Petition*

Maldonado petitioned the Riverside Superior Court for a peremptory writ of mandate setting aside the arbitrator's decision. Applying an independent judgment standard, the trial court found that the weight of the evidence supported the arbitrator's decision in four respects. First, the court noted that the arbitrator found the " 'manner' in which McDonald's cell was searched was at issue," and that testimonial and video evidence supported the conclusion that McDonald's items were "impacted, destroyed and/or were thrown off the top tier[.]" Although the court said it had "not seen" the video footage, the court cited Delgado's testimony that the search was done to "send a message," and pointed to other testimony showing that the search

11

demonstrated "incompetence, inefficiency/negligence and conduct unbecoming an officer" in violation of Department policy.

Second, the court found sufficient evidence supported the arbitrator's conclusion that Maldonado violated Department policy by failing to ensure the assault suspects were handcuffed after the incident. Although "not necessarily required[,]" the court noted testimony that handcuffing the suspects would have been the preferred practice, and that handcuffing the victim of the assault in this instance "demonstrated varied treatment[.]"

Third, the court determined that the evidence showed Maldonado violated policy by failing to recognize the impending assault. The court found that Maldonado's position and rank made him responsible for exercising "proper supervision and observation of his surroundings." Yet Goodwin walked to the top tier with Moore and Owens to fight McDonald without Maldonado recognizing that Goodwin was not locking down as instructed.

Lastly, the court found sufficient evidence that the deputies did not prepare a cell search log or activity report, and that the arbitrator properly relied on those omissions in upholding discipline. The court observed that despite "inconsistencies in the logging practices among the deputies," Maldonado himself "acknowledged that a cell search log should have been completed in this instance."

Having decided that a preponderance of the evidence supported the arbitrator's misconduct findings, the court concluded the arbitrator did not abuse his discretion in imposing a suspension and denied Maldonado's writ. Maldonado timely appealed.

12

DISCUSSION

I

Maldonado first contends the trial court erred when it found substantial evidence that the way he conducted the cell search violated Department policy.  We disagree.

*A.  Governing Law*

"When a fundamental vested right is involved, such as the right of a city employee to continued employment [citation], the trial court exercises its independent judgment to determine whether due process requirements were met and whether the agency's findings are supported by the weight of the evidence.  [Citations.]" (*Flippin v. Los Angeles City Bd. of Civil Service Commissioners* (2007) 148 Cal.App.4th 272, 279 (*Flippin*).)  "An appellate court must sustain the trial court's factual findings if substantial evidence supports them, resolving all conflicts in favor of the prevailing party, and giving that party the benefit of every reasonable inference in support of the judgment.  [Citation.]" (*Ibid.*)

*B.  Analysis*

Substantial evidence supports the trial court's findings that McDonald's items were "impacted, destroyed and/or were thrown off the top tier," and that the search was done to "send a message."  Video footage shows that the dayroom floor was empty before the search started, and that at some point during the search, items appeared on the floor underneath McDonald's cell.  McDonald testified that his cell was left in disarray and some of his food packages were opened.  During the search, McDonald saw Hinson and Maldonado throwing things over the top tier railing onto the floor of the dayroom.  Goodwin also saw items falling from the top tier during the search, and around 8:43 p.m., video footage shows Coleman retrieving items from the

dayroom floor. While the footage is choppy and it is unclear whether McDonald's items were kicked or thrown off the tier, the trial court reasonably inferred based on Delgado's testimony that there was only "one way" for McDonald's belongings to end up on the floor of the dayroom, which was for the items to be "pushed off into the tier outside of the cell door[.]"

Maldonado argues that the court erred by not reviewing the video footage and relying instead on witness testimony about what the footage shows. But we see no prejudicial error under these circumstances. While the parties dispute whether McDonald's items were thrown, kicked, or otherwise pushed off the tier, Maldonado does not dispute that items from McDonald's cell somehow ended up on the dayroom floor below, and the video footage does not show definitively how this occurred. McDonald and Goodwin both testified to seeing items falling from the top tier. Although Maldonado attempts to cast doubt on the inmates' credibility, their testimony is corroborated by Delgado's and the Department investigator's testimony, and at any rate " '[w]e do not . . . assess the credibility of witnesses on review for substantial evidence. [Citation.]' " (*San Diego Gas & Electric Co. v. Schmidt* (2014) 228 Cal.App.4th 1280, 1292.) Therefore, even if the court did not directly view the footage, other evidence in the record is sufficient to support a reasonable inference that Maldonado and Hinson caused McDonald's items to fall off the top tier and onto the dayroom floor during the search. (See *Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 66 (*Kazensky*) [trial court did not commit reversible error in not viewing videotapes because witnesses testified to video's contents and there was no significant dispute about what it showed].) Having reviewed the footage ourselves, we conclude that there is no reasonable probability of a different result if the trial court had done so.

14

As for the search being used to "send a message," Maldonado contends that because a supervisor approved the search, inmates are known to hide contraband inside commissary items, and property boxes are easily replaceable, any alleged damage to McDonald's items did not constitute a violation of Department policy. There is substantial evidence, however, that this was unlike other customary searches. McDonald testified that he and Hinson exchanged words leading up to the search, and McDonald believed Hinson was antagonizing him. No other cell was searched, McDonald's cell was left in disarray, and some of his food items were opened, but his cellmate's belongings were untouched. Goodwin testified that when Hinson approached his cell after the search, Hinson told him that the search was conducted because "[o]ne of your guys was being disrespectful." Delgado, citing his extensive "training and experience at every level[,]" believed the search was a "fuck-you cell search" which was "a catalyst" for the fight that followed. Furthermore, the record contains no definitive evidence that deputies found any contraband in McDonald's cell, and Maldonado confirmed there was no indication after the search that McDonald was under the influence of alcohol or drugs, which could have justified the search.

To the extent that Maldonado presents alternative reasonable inferences to be drawn from the record, we must nonetheless resolve conflicting evidence in favor of the Department as the prevailing party. (See *Kazensky, supra,* 65 Cal.App.4th at p. 52.) And even if a trier of fact *could* have concluded that the search was initiated for valid reasons or conducted in a manner which minimized damage to McDonald's items, the question here is not whether there would have been substantial evidence to support a finding in Maldonado's favor. Based on the evidence, the court reasonably found that the manner of the search demonstrated "incompetence,

15

inefficiency/negligence and conduct unbecoming an officer" in violation of Department policy. We therefore conclude that substantial evidence supports the court's findings regarding the impropriety of the cell search.

II

Maldonado also contends the trial court erred when it found he violated Department policy by failing to handcuff McDonald's suspected attackers. We conclude the court did not err in this respect either.

Maldonado first makes a procedural argument that because the Letter of Intent did not expressly specify his failure to handcuff as a basis for discipline, he cannot be punished for that omission. He cites no authority, however, that requires the Department to provide that level of detail in the Letter of Intent. (See *Hinrichs v. County of Orange* (2004) 125 Cal.App.4th 921, 933 (*Hinrichs*).) Maldonado relies on *Hinrichs*, but that case does little to support his position because the Court of Appeal did not "necessarily disagree with the [agency's] contention that it was not obligated to give [the appellant] more than a general description of the allegations against her." (*Ibid.*) The Court of Appeal went on to note that "[s]ection 3303 provides only that [the appellant] is entitled to be 'informed of the nature of the investigation prior to any interrogation.' [Citation.] Under that standard, it would be difficult to argue [the appellant] was entitled to a detailed specification of the exact charges leveled." (*Ibid.*) Furthermore, *Hinrichs* is distinguishable because although the agency in that case specified a particular regulation it alleged the officer violated, the agency provided *no other description* of the alleged wrongful conduct, and then subsequently imposed discipline based on a *different* regulation. (*Ibid.*)

Here, the Department's Letter of Intent cited the specific MOU provisions it alleged Maldonado violated, along with the Department's

16

General Orders under sections 105.09 and 203.07.  The letter also stated that the violations were committed in connection with the cell search and McDonald's assault, alleging that he failed to recognize or correct Hinson's actions, causing injury to McDonald and the Department.  Maldonado was ultimately disciplined for acts falling within that general description, and only under those specific provisions and orders—not the Penal Code, California Title 15, or Corrections Division Policy, for which "no corresponding factual basis" was given.

Even if the trial court's reliance on Maldonado's failure to handcuff constituted a procedural due process violation, any such error would be subject to a harmless error analysis. (*Hinrichs*, *supra*, 125 Cal.App.4th at p. 928.)  In this case, like the appellant in *Hinrichs*, Maldonado does not argue that the Department's failure to expressly inform him about the failure to handcuff prejudiced him in any way. (*Ibid*.)  He does not assert that he had inadequate notice of, or opportunity to rebut, the allegation that his omission violated Department policy.  In fact, the failure to handcuff the assault suspects was discussed at length in the Department's investigation report, which according to the Letter of Intent, was provided to Maldonado several months in advance of the arbitration hearing.  And during the arbitration hearing, Maldonado's counsel raised the topic of handcuffing practices with multiple witnesses, with the apparent aim of rebutting the allegation.  She cross-examined Cepeida about whether "it was policy" or just "preferrable" that inmates "had to be handcuffed during transport[.]"  She asked four of Maldonado's deputy witnesses whether policy requires handcuffing assault suspects, and three responded in the negative while one did not know.  During Maldonado's own testimony about the video footage, he brought up that "the suspects weren't handcuffed" and spoke at length about

17

his understanding of when inmates should be handcuffed. Even the arbitrator asked witnesses questions about handcuffing practices. Accordingly, even if the court committed error because the Letter of Intent did not expressly identify Maldonado's failure to handcuff as a basis for discipline, any error would be harmless. (*Id*. at pp. 927–928 [finding any procedural due process violation in failing to provide proper notice to be harmless].)

We turn next to whether there is substantial evidence to support the finding that Maldonado violated Department policy by failing to ensure the suspects were handcuffed along with McDonald. We conclude that there is. As the court noted, although "not necessarily required[,]" witnesses testified that handcuffing the suspects would have been the preferred practice, and that handcuffing the victim of the assault in this instance "demonstrated varied treatment[.]" Multiple deputies testified that they are trained to handcuff assault suspects, they train others to do so, or they would have done so here. Even Maldonado testified that he tells trainees to handcuff both suspects and victims because it is "the safest way[,]" and he acknowledged that assault suspects are typically handcuffed. Delgado testified that in this particular dayroom, it was unusual that only McDonald was handcuffed, but not the suspected aggressors. Considered in its totality, the evidence is sufficient to support a finding that the decision to handcuff McDonald but not the inmates who assaulted him violated Department policy.

Even if Maldonado had plausible reasons for deciding against handcuffing the suspects—such as his own discretion or to maintain inmate rapport—we must resolve conflicts in favor of the Department, and reasonable inferences support the court's finding that Maldonado was negligent in these circumstances. (See *Flippin, supra*, 148 Cal.App.4th at

18

p. 279.)  Accordingly, we conclude the court did not err in finding Maldonado's failure to handcuff the assault suspects was a valid basis for discipline.

III

Maldonado next argues that the trial court erred when it determined that substantial evidence supports the finding that Maldonado violated Department policy when he failed to recognize the impending assault.  We again disagree.

Maldonado first claims that the Department waived this ground for discipline by failing to provide supporting record cites in its trial court brief.  Maldonado also argues that neither the arbitrator nor the court "identified any portions of the record supporting" the finding that Maldonado failed to realize that Goodwin was going to assault McDonald.  But the Department's trial court brief does cite testimony describing video footage of Goodwin proceeding up the stairs towards McDonald after the search.  The brief also cites the arbitration decision's reference to Goodwin's testimony in which he told deputies he would "deal with" McDonald later, and how when the bottom tier opened, Goodwin was not locking down and "was proceeding up the stairs" to confront McDonald.  Accordingly, we conclude the Department did not waive the issue.

Maldonado's primary contention is that there was insufficient evidence to support finding he was negligent in failing to anticipate the fight.  The trial court, however, cited multiple reasonable bases with support in the record for its finding.  The court noted that Maldonado could have observed, based on Goodwin's movements both alone and with Moore and Owens, that Goodwin "was preparing to engage in an altercation with McDonald." Goodwin testified that he told the deputies he planned to "deal with" or discipline McDonald for getting dayroom time suspended.  Maldonado

19

observed in his own narrative of the video footage that Goodwin and other inmates were refusing instructions to lock down when Goodwin went up to McDonald's cell to talk to him. The Department investigator testified that when Goodwin emerged from his cell right before the fight, he did not have a shirt on because he was "ready to assault [McDonald], and it's easier to assault someone with . . . a shirt off than it is on." Although Maldonado said that an inmate being shirtless "doesn't necessarily mean that a fight is going to occur" because the inmate "could be going to the showers[,]" he also acknowledged that "[i]nmates typically fight with their shirts off." Moreover, Maldonado could not explain why the bottom tier, and then both tiers, were opened in the first place, which allowed the fight to happen.

The court found that Maldonado's position and rank made him responsible for exercising "proper supervision and observation of his surroundings." It was thus reasonable for the court to infer—given the selective search of McDonald's cell, the dayroom suspension that followed, Goodwin's expressed intention to "discipline" McDonald, and footage of Goodwin approaching McDonald's cell without a shirt on and with two other inmates following alongside—that Maldonado was negligent when he failed to appreciate that a fight was imminent. And contrary to what Maldonado argues, this conclusion is not inconsistent with finding that Hinson did not *orchestrate* the attack, nor is it at odds with Maldonado's testimony that he believed Goodwin was going to the showers. Even if Hinson did not *direct* Goodwin to assault McDonald, and even if Maldonado genuinely believed Goodwin could be going upstairs to shower, a reasonable trier of fact could still deem Maldonado negligent for failing to act in light of multiple warning signs that conflict was brewing. "Where the evidence supports more than one reasonable inference, we are not at liberty to substitute our deductions for

20

those of the trial court." (*Morrison v. Housing Authority of the City of Los Angeles Bd. of Comrs.* (2003) 107 Cal.App.4th 860, 868.) We therefore conclude the court did not err in finding that Maldonado violated Department policy when he failed to recognize the impending assault.

IV

Maldonado further contends that the trial court erred when it ruled that substantial evidence supports the finding that he violated Department policy by failing to log the cell search. We are not persuaded.

Maldonado begins with the same procedural argument he made regarding the failure to handcuff: that because the Letter of Intent did not expressly mention the failure to complete a cell search log form as a basis for discipline, he cannot be punished for that omission. We find this argument unpersuasive for the same reasons we discuss above, including that Maldonado fails to cite authority requiring the Department to provide that level of specificity in its notice letter. The letter clearly states that the alleged policy violations were committed in connection with "a cell search [Maldonado] conducted" during which McDonald's property "was destroyed[.]" Maldonado again does not explain how he was prejudiced by the letter's lack of specificity, or how he had insufficient opportunity to rebut the allegation. The Department's investigation report stated that "the cell search log did not indicate" that McDonald's cell was searched, and that a cell search log "should have" been completed. Moreover, during the arbitration hearing, Maldonado's counsel raised the issue of documenting cell searches with multiple witnesses. Accordingly, even if the court had erred because the Letter of Intent did not expressly identify Maldonado's failure to document the cell search as a basis for discipline, any error would be harmless.

21

We further conclude substantial evidence supports the finding that Maldonado's failure on this front violated Department policy. To rebut testimony that the cell search should have been documented and that deputies are trained to log searches, Maldonado relies on testimony that in practice, not every cell search is logged. He also asserts that Cepeida was responsible for completing the cell search log. But even Maldonado said he "might have made some mistakes as far as paperwork and . . . entries on the log, but nothing intentionally[.]" The record also shows that Maldonado was the senior deputy on duty that night, with responsibility for "directing the work" of junior deputies like Cepeida, and that Cepeida was brand new to the job. Furthermore, as we already noted, even if Maldonado had plausible reasons for foregoing documentation here, we resolve all evidentiary conflicts and draw all legitimate reasonable inferences in favor of the trial court's decision. (See *Flippin, supra*, 148 Cal.App.4th at p. 279.) Given the evidence that Maldonado's responsibilities included ensuring that a cell search log form was completed, we conclude the court did not err in finding Maldonado's failure to log the cell search was a valid basis for discipline.

V

Lastly, Maldonado argues that the trial court abused its discretion in upholding his 317-day suspension. (See *Kazensky, supra*, 65 Cal.App.4th at p. 48 [" '[T]he penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated[.]' "].) More specifically, he contends that the suspension was based cumulatively on the four instances of misconduct already discussed, and that the reversal "of *any one* of these findings would necessitate vacating the disciplinary sanction." Because we conclude that all four grounds for

22

discipline are supported by substantial evidence, Maldonado's argument is unpersuasive.

Furthermore, Delgado testified based on his extensive experience that Maldonado's negligence was unprofessional, incompetent, and unsafe in that it ultimately "set[] inmates up for assault[,]" exposing the Department to liability. Both the arbitrator and the trial court noted this was not Maldonado's first time facing discipline, and the record shows he was suspended in 2017 for conduct unbecoming of a Department member after he assaulted a female deputy. (See *Thornbrough v. Western Placer Unified School Dist.* (2013) 223 Cal.App.4th 169, 192 [past discipline is one "relevant factor[] to consider in determining whether" misconduct warranted the penalty imposed].)

"If reasonable minds may differ as to the propriety of the penalty imposed, there has been no abuse of discretion. [Citation.] It is only in the exceptional case, when it is shown that reasonable minds cannot differ on the propriety of the penalty, that an abuse of discretion is shown. [Citations.]" (*Deegan v. City of Mountain View* (1999) 72 Cal.App.4th 37, 46–47.) The trial court's findings in this case indicate that, intentional or not, Maldonado's actions and omissions led to an inmate being assaulted for nearly a full minute by three other inmates. We conclude that the court did not abuse its discretion in upholding the 317-day suspension.

23

## DISPOSITION

The judgment of the trial court is affirmed.  The Department is awarded its costs on appeal.


BUCHANAN, J.

WE CONCUR:


O'ROURKE, Acting P. J.


IRION, J.